(21 Misc. Rep. 252.)

## CRUGER v. PHELPS et al.

(Supreme Court, Special Term, New York County. May, 1897.)

1. DOMICILE—FOREIGN TRAVELS.

P. was born in New York in 1816, where he was admitted to the bar, and also studied medicine. He lived there until 1848, when he married, and went with his wife to Europe. They remained away until 1858, after the birth of a daughter, when they returned to New York. In 1866 they went abroad again, and traveled about, and resided in many different parts of Europe, until 1876, when they returned to New York. There they remained 28 months, part of the time maintaining a household, and part of the time living at hotels. They then went to Europe, and remained at Pau, France, until June, 1880; and during the six years following they spent the winters there, and the summers at hotels in different parts of Europe. At Pau they were at an hotel one season, at an apartment house another, and the balance of the time in a furnished house, rented by them. In August, 1886, they returned to New York, where, on September 11, 1886, P. executed his will; and two months afterwards they again went to Europe. In 1887 he became non compos, and a committee of his property was appointed in New York, his wife being appointed committee of his person. They lived at Pau for some time, and then went to Paris, where P. died July 8, 1894. He was buried at Pau, where he had purchased a lot, on which he erected a large monument or vault, and where he had expressed a desire to be buried. He had, in 1865, expressed a determination to live in Europe, and at various times declared his intention to remain, die, and be buried at Pau, and never return to New York to live. In his letters and conversations he expressed a preference for Europe, and in connection therewith used the words "reside," "residence," "domicile," and "home." He insisted that his wife and daughter could not live in New York on account of the climate, which he referred to as "detestable." He owned a large amount of real estate in New York, and never sold any of it after 1860. He also had considerable personal property, all of which consisted of American securities deposited in such city, while the only property he owned in Europe was the cemetery lot, clothing, jewelry, and a small amount of furniture. In resigning as trustee in a deed of trust, in 1866, he gave as the reason that he contemplated visiting foreign countries, and remaining for a considerable time. He prepared his own will, and referred to himself as "of the city, county, and state of New York"; and in all the numerous deeds, contracts, leases, and other papers executed by him during the previous 40 years, both in Europe and New York, many of them written by him, he was described in the same way. In his wife's will, executed at Pau, in 1886, and supervised by him, she was described as of the city, county, and state of New York, "now traveling in Europe, and for the time being temporarily sojourning in the city of Pau, France." Each will named two residents of New York as executors, and a corporation of such city as trustee. All his relatives and the beneficiaries under his will were in New York; and in one provision he said, "If I happen at the time of my death to be traveling or sojourning in Europe, then all moneys" to his credit in any European bank should go to his wife, if living. Before going to Europe, after making his will, in giving an architect directions for alterations in a building, he said, "I will be back in the spring;" and he never sought or obtained from the French government authority to reside in France under the Code Civil. *Held*, that P.'s domicile was in New York when he executed his will.

**2. WILLS—VALIDITY.**

A provision in a will, whereby testator's daughter, whose husband resided in New York, forfeited her right to the income of the residuary estate in case she traveled or resided outside the continent of Europe during her husband's life, or until "she shall be divorced from him a vinculo matrimonii, and remain so divorced from him," was void as against public policy and good morals.

**3. SAME—EFFECT OF INVALID PROVISIONS.**

Testator gave the residue of his estate in trust to pay his married daughter $6,000 yearly in quarterly installments, free from the control of her husband, subject to the condition that during the lifetime of her husband, who resided in New York, she should travel or reside only on the continent of Europe, unless she should be divorced from him a vinculo matrimonii, and remain so divorced from him. *Held*, that the invalidity of the portion of the will imposing such condition did not affect the other parts of the will.

Action by Stephen Van Rensselaer Cruger, as executor of the will of John Augustus Pell, deceased, against Eleanor Livingston Phelps and others.

This action is brought to determine whether the distribution of the personal property of testator is to be governed by the law of France or of New York, and whether the italicized portion of the following paragraph of his will is valid:

"(4) All the rest, residue, and remainder of my estate, real and personal, wheresoever found, of which I may die possessed or entitled to, or not be effectually given and disposed of by this, my will, I give, devise, and bequeath to the New York Life Insurance & Trust Company in the city of New York, to have and to hold the same during the lives of my said wife and daughter, and during the life of the survivor of them, upon the trusts and to and for the uses and purposes following:

"First. In trust to collect and receive all the rents, interest, and profits thereof, and apply, transmit, and pay over of the same in quarterly payments to the use of my daughter, Eleanor Livingston Phelps, yearly, and every year of her life, the sum total of six thousand dollars, always in quarterly installments, on her personal receipt, free from any control of said Phelps or any other husband she may at any future time have, *but nevertheless subject always to the conditions I hereby for most especial reasons impose, viz. that during the lifetime of her present husband, Charles Harris Phelps, she shall reside or travel on the continent of Europe only, unless she shall be divorced from him 'A vinculo matrimonii,' and remain so divorced from him. A mere statement in writing from her to the effect that she has resided or traveled on the continent of Europe during the three months preceding any such quarterly payment shall be sufficient authority for transmitting, paying over, or applying to her use the said yearly allowance. In case, however, my said daughter shall reside or travel out of Europe during her marriage to her said husband, the said allowance for such period only as she shall reside or travel out of Europe shall be paid over to my brother George W. Pell, or to his heirs, and in case neither my said brother be living nor any heirs surviving him, or if he nor they shall accept such allowance for any such time, then the same for such time only shall be paid over to the Children's Aid Society of the City of New York.*

"Secondly. In trust, as aforesaid, to collect and receive all the rents, income, and profits of my real and personal residuary estate, and, after deducting the aforesaid amount of six thousand dollars for my said daughter, to pay over or apply the remainder of such rents, issues, and profits in quarterly payments to the use of my said wife for and during her lifetime.

"Third. After the death of my wife in trust as aforesaid to receive all the rents, income, and profits of my said estate, and pay over or apply or transmit the same in each year of her life to the use of my daughter in quarterly installments, exclusively on her personal receipt, *but subject always to the conditions and limitations hereinbefore imposed as to traveling and residence as whilst in receipt of said allowance.*

"Fourth. Upon the death of both my wife and daughter, and in the event that my daughter shall die without leaving a child or children her surviving, then I give, devise, and bequeath forever all the rest, residue, and remainder of my said estate, real and personal, to such persons living at the time of my death as would inherit the same in case of my death intestate or unmarried, and in the share or shares in which such person or persons would so inherit said estate."

Coudert Bros. (Frederick R. Coudert and D. J. Holden, of counsel), for plaintiff.

William Blaikie, guardian ad litem, for Charles H. L. Phelps.

J. W. Boothby, for A. D. Pell and others.

Maunsell B. Field, in pro. per.

E. W. Sheldon, for United States Trust Co.

Jacob Marks, guardian ad litem.

Flamen B. Candler, for defendant Jay.

Whitehead, Dexter & Osborne (H. L. Johnson, of counsel), for Children's Aid Society.

CHASE, J.    An executor takes the legal title to the personal estate of the testator as a trustee.    Equity has jurisdiction over trusts, and such jurisdiction is exercised to construe wills whenever necessary to guide the action of the trustee.    This action is brought by the executor to determine the legal domicile of the testator at the time of the execution of his will, and, in case the testator's legal domicile was in France, what law governs the distribution of his personal estate; and it is also brought to obtain a construction of such will so far as it relates to personal property.    The plaintiff is entitled to the direction of the court in regard to his trust, and the action is maintainable.

Section 2694 of the Code of Civil Procedure, after directing in regard to the validity and effect of a testamentary disposition of real property, provides:

"Except where special provision is otherwise made by law, the validity and effect of a testamentary disposition of any other property situated within the state, and the ownership and disposition of such property where it is not disposed of by will, are regulated by the laws of the state or country of which the decedent was a resident at the time of his death."

By section 2611 of the Code of Civil Procedure it is provided:

"* * * The right to have a will admitted to probate, the validity of the execution thereof, or the validity or construction of any provision contained therein, is not affected by a change of the testator's residence made since the execution of the will. * * *"

It therefore becomes necessary first to inquire where the testator was legally domiciled on the day of the execution of his will.    John Augustus Pell, the testator, was born in the year 1816.    He was a native-born citizen of the state of New York.    He lived in New York until the year 1848, when he married, and almost immediately thereafter went with his wife to Europe, where they remained until after the birth of their daughter, the defendant Eleanor Livingston Phelps, and until the year 1858, when they returned to the state of New York, and remained here until about the year 1866.    In that year they returned to Europe, and traveled about, and resided in many different parts of Europe, until the month of June, 1876, when they again re-

turned to New York. He then remained here with his family, part of the time maintaining a household and part of the time living in summer and other hotels in and about New York, until the 18th day of October, 1879, when he went with his wife to London, and from London to Paris, and then to Pau, France, a famous winter and health resort, where they remained during the balance of the winter season and until June, 1880. From 1880 to 1886 he spent his summers at hotels in different parts of Europe, being one summer in the Pyrenees and at Vichy, one summer in Bavaria, one summer in Genoa, one summer at Osborne, England, and during the winter seasons he was at Pau, France, one season at a hotel, one season at an apartment house, and after 1882 at the Villa Montpensier, a furnished house at Pau, rented by him. In August, 1886, he returned to the state of New York, and while in New York, on the 11th day of September, 1886, he made and executed his last will and testament, which is in controversy in this action. He returned to Europe in November, 1886. In 1887 he became non compos mentis, and a committee of his property and estate was appointed by the supreme court of the state of New York in that year. His wife, Susan M. Pell, was appointed committee of his person. Mr. Pell continued to live with his wife at Pau, France, for some time thereafter, and was then taken by her to Paris, where he died on the 8th day of July, 1894, and was buried in the cemetery at Pau. Mr. Pell frequently expressed a preference for Europe and France as a place of residence. The son-in-law of Mr. Pell testifies that Mr. Pell told him that he reached the determination to live in Europe in the year 1865. He also testifies that Mr. Pell always declared his intention to remain in Pau, and to die and be buried there, and that he repeatedly declared that he never would return to the city of New York to live. Some time prior to making his will, he purchased in perpetuity a lot in the cemetery at Pau, and had erected thereon a large monument or vault, and he expressed the desire that wherever he died his remains should be brought to Pau, and be buried in such vault. While at Pau he had visiting cards printed with the prefix, "De" before his name as follows: "J. Aug. De Pell," and had his trunks marked in the same way. Before going to Europe in 1866, Mr. Pell, who was one of the trustees in a deed of trust made by Moses Augustus Field and others, resigned his trust, and in the instrument of declination Mr. Pell says:

"Whereas, John A. Pell, of the said trustees, contemplates visiting foreign countries, and remaining absent from the United States of America for a considerable period of time, whereby he will be unable to act as one of said trustees."

It was claimed by Mr. Pell that it was constitutionally impossible for his wife or his daughter, Eleanor Livingston Phelps, to live in New York; and he further says, in writing to his daughter:

"You have tried it under the best circumstances, and slowly but surely gave way, and was most speedily going to your grave. The same has three times happened to mama,—first before coming to Europe, when three doctors ordered her to leave New York, and again twice after returning from Europe, hale and hearty. Here you know she is always well, excepting that weakness of the chest."

In the many letters that were offered in evidence upon the trial of this action Mr. Pell frequently speaks of the necessity of his wife and daughter remaining in Europe by reason of their inability to withstand what he calls in one letter the "detestable" climate of New York.    Again, in a letter to his son-in-law in 1883, relating to his daughter, in speaking of the wholesale purchase of carpets and rugs by him, he says:

"They certainly are not wanted here, nor can they be at New York. You well know Eleanor has fairly tried the climate, and that a continued residence there would soon result in death. Her constitution is similar to that of her mother, and, like her, she requires a climate of neither excessive heat or cold. * * * If experience goes for anything, then you know that Eleanor's life would be sacrificed at New York. Our lives depend so greatly upon hers that I most assuredly would make no provision for her living in that most atrocious climate."

Mr. Pell was the owner of a large amount of real estate in New York, but it does not appear that he ever sold a piece of real estate that he owned individually after 1860.    He had considerable personal property, all of which was invested in American securities, and they were deposited for many years, and up to the time of his death, with the New York Life Insurance & Trust Company, a New York corporation, having its office in New York, and investments were made and changed, under the direction of Mr. Pell, by such trust company. · Mr. Pell never made an investment of any kind whatever, either real or personal, in Europe.    No property of any kind whatever has come to the hands of the executors from Europe, and the only property in Europe owned by Mr. Pell at the time of his death, other than the cemetery lot, was his personal clothing, jewelry, and a service of porcelain mounted with his monogram, and a few articles of furniture that he used in connection with the furnished house that he occupied shortly previous to his death.    From 1847 down to and including 1886 a large number of deeds were executed from and to him individually and as trustee of New York real estate, and in every instance he was described in such deeds either "of the city of New York" or "of the city, county, and state of New York."    Many of these deeds were in his handwriting, and with all of which he was personally familiar.    During this period other papers, contracts, and agreements were made by him, many of which were in his handwriting, and in all of which he was described as stated.    During all these years a very large number of leases were made relating to his real estate, most of which he drew himself, and in all the leases he ever had drawn he was described as of the city. county, and state of New York.    On the 1st day of August, 1882, Mr. Pell delivered a lease to a tenant, Charles Jones, which lease was prepared and executed in Europe, and sent by Mr. Pell to Mr. Jones; and in this lease he describes himself as of the city of New York, and after this statement is interlined, "Temporarily residing at Paris."    This interlineation was in the instrument when it was delivered to Mr. Jones by Mr. Pell.    During his visit to New York in 1886 he made a contract for the purchase of a piece of real estate on Fifth avenue, and arranged for its improvement for business purposes.    This contract was in his handwriting, and in it he describes himself as "of the state of

47 N.Y.S.—5 .

New York." The deed of this property was afterwards delivered to him, in which his residence is stated the same as in the contract. His wife, Susan M. Pell, executed her will at Pau, France, on the 7th day of January, 1886. It was either prepared by Mr. Pell, or supervised by him, and the interlineations in the will were in his handwriting, and noted by him. In this will Mrs. Pell is described as follows:

"I, Susan M. Pell, of the city, county, and state of New York, United States of America, now traveling in Europe, and for the time being temporarily sojourning in the city of Pau, France, wife of John Augustus Pell, of said city of New York."

By her will she named the same executors and trustees, corporate and individual, as named by Mr. Pell in his will, and she provides in different places in her will, on certain contingencies, for a division of her estate among "such person or persons as would inherit my real property, situated in said state of New York, in case of my death in said state unmarried and intestate." Mrs. Pell died in December, 1893, and her will has been duly probated in the county of New York.

Mr. Pell prepared his own will. It is in his handwriting, as are all the indorsements thereon. In this will he describes himself as follows: "I, John Augustus Pell, of the city, county, and state of New York, United States of America." He named as his executors two residents of the city and county of New York, and as his trustee a New York corporation, and, in the event of such corporation declining to act as such trustee, another New York corporation, and, in the event of such corporation declining to act as such trustee, several individuals, all residents of the state of New York. All of the persons and corporations who are beneficiaries under his will, so far as appears, are of the state of New York, and all of his relatives are of old New York families. He also provides that, if any of the persons named in the fourth subdivision of his will do not accept the allowance of income as therein stated, that the same shall be paid over to the Children's Aid Society of the city of New York, a corporation of the state of New York. Not one dollar of money or property is given absolutely or contingently to a person or corporation outside of the state of New York. He directs his trustees to invest so much of his residuary estate as consists of personal property "in public securities of any of the United States not situated in a latitude south of the state of Pennsylvania, or in first mortgage railway company bonds the market value of which shall not be more than 5 per cent. below par value thereof at the time of making such investments, and in amounts not exceeding $5,000 in bonds of any one of such companies, or in bonds secured by first mortgages on real estate in the city of New York or Brooklyn, in the state of New York. Among the other provisions in said will is the following:

"I give and bequeath to my wife all moneys which at my death may be standing to my credit, or to which I may be entitled, in any bank in the city of New York other than the New York Life Insurance and Trust Company, or if I happen at time of my death to be traveling or sojourning in Europe, then all moneys which may be to my credit in any European bank; or if she be not then living, then, and in such case, I give and bequeath in trust to the New York Life In-

surance and Trust Company all such moneys, to become a part of my personal estate."

He also provides in his will, on certain contingencies therein named, for the division of a certain part of the residue of his estate among "such person or persons as would inherit from him his real estate in state of and by the laws of New York were he to die intestate or unmarried owning land in said state, and in such share or shares as such person or persons would so inherit such real estate. The will was executed in the city of New York, before witnesses residing in said city, in the form used in, and in conformity with the laws of, the state of New York. His will was probated in the surrogate's court of the county of New York in January, 1895, and the plaintiff was duly appointed executor, and entered upon the discharge of his duties as such executor. After making his last will, and in October, 1886, in conversation with the architect engaged in the alteration of the Fifth avenue building purchased by him while he was in New York, he had conversations with him in regard to changing an apartment house, and when he left said: "I will be back in the spring, and I want you to make alterations for the Carlton House. In the meantime you look it up carefully, and consult with my brother, George." He never sought for or obtained the authorization of the French government to his residence in France under article 13 of the Code Civil.

Some of the leading rules of law relating to domicile are laid down by the court of appeals in Dupuy v. Wurtz, 53 N. Y. 556, as follows:

"For the purposes of succession every person must have a domicile somewhere, and can have but one domicile, and that the domicile of origin is presumed to continue until a new one is acquired. * * * To effect a change of domicile for the purpose of succession there must be not only a change of residence, but an intention to abandon the former domicile, and acquire another as the sole domicile. There must be both residence in the alleged adopted domicile and intention to adopt such place of residence as the sole domicile. Residence alone has no effect per se, though it may be most important as a ground from which to infer intention. Length of residence will not alone effect the change; intention alone will not do it; but the two taken together do constitute a change of domicile. This rule is laid down with great clearness in the case of Moorehouse v. Lord, 10 H. L. Cas. 283–292, as follows: Change of residence alone, however long continued, does not effect a change of domicile as regulating the testamentary acts of the individual. It may be and is strong evidence of intention to change the domicile, but unless, in addition to residence, there is an intention to change the domicile, no change of domicile is made. And in Whicker v. Hume, 7 H. L. Cas. 139, it is said the length of time is an ingredient in domicile. It is of little value if not united to intention, and is nothing if contradicted by intention. And in Aikman v. Aikman, 3 Macq. 877, Lord Cranworth says with great conciseness that the rule of law is perfectly settled that every man's domicile of origin is presumed to continue until he has acquired another sole domicile with the intention of abandoning his domicile of origin; that this change must be animo et facto, and the burden of proof unquestionably lies upon the party who asserts the change. The question what shall be considered the domicile of a party is in all cases rather a question of fact than of law. Bruce v. Bruce, 6 Brown, Parl. Cas. 566. With respect to the evidence necessary to establish the intention, it is impossible to lay down any positive rule. Courts of justice must necessarily draw their conclusions from all the circumstances of each case, and each case must vary in its circumstances. And, moreover, in one a fact may be of the greatest importance, but in another the same fact may be so qualified as to be of little weight. 12 Moore, P. C. 330. In passing upon such a question in view of the important results flowing from a change of domicile the intention to

make such a change should be established by very clear proof, especially when the change is to a foreign country. The intention may be gathered both from acts and declarations. Acts are regarded as more important than declarations, and written declarations are usually more reliable than oral ones."

### Dicey, in defining domicile, uses this language:

"A person's home is that place or country either in which he in fact resides with the intention of residence, or in which, having so resided, he continues actually to reside, though no longer retaining the intention of residence, or with regard to which having so resided there he retains the intention of residence, though he in fact no longer resides there." Dicey, Dom. p. 44.

A change of domicile to a foreign country is so injurious to the welfare of families, and affects so radically the validity and construction of testamentary acts, the disposition of property in case of intestacy, the rights of married women, the relations of husband and wife, and everything affected by legal principles depending for their solution upon the place of domicile, that it should only be established by the clearest and most convincing and satisfactory evidence. Where, as in this case, the domicile of origin corresponds with the domicile of all the relatives of such person, and the property interests, as well as the residence of the executors, trustees, and beneficiaries under the will, are all at the place of such domicile of origin, the evidence to establish a change of domicile should be something more than casual and unadvised statements, made without special reference to the technical meaning of the language used. In cases of succession it requires plain and certain evidence showing a fixed and definite purpose to establish that a person has become a foreigner to his native land. Mr. Pell was a highly-educated man, possessed of a large property, real and personal. He was very careful, conservative, and accurate in all his business transactions and dealings. He had studied medicine here, and he had also studied law, and was admitted as an attorney and counselor of the supreme court of the state of New York. It is not claimed that Mr. Pell's stay in Europe from 1848 to 1858 was with any intention of changing his domicile. His intentions in going to Europe in 1866 are best expressed in the instrument resigning a trust, when he says he "contemplates visiting foreign countries, and remaining absent from the United States of America for a considerable period of time." He remained away 10 years, going from place to place, his acts not indicating any intention of fixing upon any particular place even as a place of sojourn. It appears from his letters that his trip to Europe in 1848, immediately after his marriage, was on account of the health of his wife, and under orders from her physician. He says she returned hale and hearty twice (1858, 1876) but that he was required to seek a climate of neither excessive heat nor cold. There is nothing whatever to indicate any intention on the part of Mr. Pell to acquire a domicile in Europe prior to 1879, and nothing to indicate that he had any idea of returning to Europe when he came, with his family, to New York, in 1876. He went to Europe in 1879 because, as he repeatedly states, it was necessary to save the lives of his wife and daughter. It is true that in his letters and conversations he at times expressed a preference for Europe. Such preference was generally expressed in connection with the necessity of

residing there on account of the health of his wife and daughter, and that his happiness depended so largely upon their health. In such conversations and letters he used the words "reside," "residence," "domicile," and "home," in my judgment, without much reference to their technical meaning, but with reference to his place of temporary sojourn. In one letter he speaks of home as being abroad, and in the same letter uses the same word referring to this country. His daughter's husband desired that she should go with him to New York, but Mr. Pell was so imbued with the belief that to do so would sacrifice her life that he went to great length, even to the verge of separating her from her husband, in persuading her not to go. His letters are filled with this thought, and if at times language is used uncomplimentary to his native country it was more to divert his daughter from her thoughts of returning home than an expression of dislike on his part. His regard for New York, its institutions, and its people, are more accurately shown in the bequests and appointments under his will. His living in Europe at all times prior to the making of the will was migratory, and according to his caprice; and in his conversations and letters, in speaking of living in Europe, instead of specifying a particular place, or referring to his residence, domicile, or home in a particular place, he speaks of living "abroad," or "in Europe," or "in France," or "on this [other] side of the Atlantic." This is too uncertain and indefinite to make anything like convincing and satisfactory proof of a change of domicile to a particular place in a foreign country. At the time of the conversations mentioned in the testimony and of writing most of the letters he was an old man, and he repeatedly stated that he could live but a short time. He believed that it would be impossible for him to live for any length of time with his wife in New York, without serious injury to her health, but that by remaining in Europe she would outlive him. It is possible that he anticipated spending most, if not all, of his days on the other side of the Atlantic. This is not inconsistent with the intention of retaining his domicile of origin in New York. In deeds and other instruments executed by and to him there is a uniform and unvarying reference to his residence in the city of New York. This statement is made in instruments prepared and executed in France and other parts of Europe as well as in instruments prepared and executed in this country. Such designation in these papers was not the work of a draftsman, but the work of the testator. They present a continuous, unequivocal, and consistent statement of intention in solemn instruments covering all the period in question. These statements were made when there was no controversy, and cover such a long period of time as to preclude the idea of their being made with reference to property rights, and they were so deliberately and frequently made as to preclude the idea of carelessness or inadvertence. To hold in the face of all these declarations that Mr. Pell intended to change his legal domicile is to brand him as a deliberate falsifier.

These declarations, under the circumstances, are in the nature of facts, rather than declarations (Inhabitants of Ward v. Inhabitants of Oxford, 8 Pick. 476), and to my mind outweigh any declarations

that may have been made to the contrary, and are conclusive in favor of the contention of the defendants that Mr. Pell, when he made his will, and when he died, was legally domiciled in New York. The whole tenor of his will is inconsistent with the idea of his being domiciled abroad. It is conceded that the trusts are void under the French law. The will should be construed under the law of this state, as testator intended, where its general provisions are effective and valid.

As to whether the courts of France would assume jurisdiction of the personal estate situated in New York if Mr. Pell had a domicile de facto in France,—query? It is unnecessary to decide this question, for the reason that I hold that Mr. Pell never lost his domicile of origin in New York.

The only other question to be determined in this action is as to whether the condition mentioned in the fourth subdivision of his will is void, and, if void, what effect, if any, it has on the other parts of the will. The condition in the will by which the daughter forfeits her right to the income of the residuary estate in case she resides or travels outside of the continent of Europe, is expressly limited to the lifetime of her husband, or until "she shall be divorced from him a vinculo matrimonii, and remain so divorced from him." The daughter's husband, Charles Harris Phelps, is a member of the New York bar, and his home is in New York. During most of the time since his marriage to the daughter of Mr. Pell in 1879 he has traveled with her in Europe and other parts of the world. The evidence shows that he desired to return to New York, and that his wife, to some extent, shared in that desire. This was a matter of frequent controversy between them and Mr. Pell. Mr. Pell told Mr. Phelps he would take his wife away from him, and that he had made testamentary provisions to prevent his ever living with his wife in America. The condition, being imposed only during the lifetime of her husband, or until she obtains a divorce from him, is a direct inducement to the daughter to procure such divorce. The separation of husband and wife impairs the peace of families, seriously affects the offspring of the marriage, and is at war with the best interests of society. The courts have uniformly held all contracts and provisions tending to induce a husband and wife to live separate or be divorced void as against public policy and good morals. 2 Redf. Wills (3d Ed.) p. 314; Schouler, Wills, § 604; 2 Jarm. Wills, p. 62; Whiton v. Snyder, 54 Hun, 552, 8 N. Y. Supp. 119; Potter v. McAlpine, 3 Dem. Sur. 108. The condition referred to is void. The other provisions of the will can stand as if the will had been written entirely omitting all that part thereof relating to the condition.

Judgment may be prepared accordingly, with costs to be paid out of the estate; the amount of costs, and to whom allowed, to be settled when the formal decision and judgment are settled by me.