Argued 11 October, decided 4 December, 1906.

**REED'S WILL.**

PICKERING *v.* WINCH.

87 Pac. 763.

DOMICILE CONSIDERED.

1. The meaning of the word "domicile" considered.

DOMICILE—PRESUMPTION AS TO CHANGE—BURDEN OF PROOF.

2. A domicile once shown to have existed at a particular place is presumed to remain there, and the burden of proof is on the one claiming it to have been changed.

DOMICILE—RESIDENCE—INTENT TO REMAIN.

3. Residence is a fact to be considered in determining the place of domicile, but domicile cannot exist at a particular place without residence and an intent to remain there.

CHANGE OF DOMICILE.

4. Within the established rule as to the concurrence of events necessary to constitute a change of domicile, it must be held that Amanda Reed did not change her domicile from Oregon to California, though she did have a temporary residence in the latter state for several years.

VALUE OF STATEMENTS AS TO INTENTION OF RESIDENCE.

5. Casual statements as to the intent accompanying one's change of residence are of less value as evidence than deliberate business declarations or avowals to intimate friends and to relatives.

From Multnomah: ARTHUR L. FRAZER, JOHN B. CLELAND and MELVIN C. GEORGE, Judges.

Statement by MR. CHIEF JUSTICE BEAN.

This is a contest over the probate in an Oregon court of the will of Amanda W. Reed, who died at Pasadena, California, in May, 1904. Mrs. Reed was the widow of S. G. Reed, deceased, and died without children. Her will was executed September 4, 1901, in this state, and recited that she resided at Portland. It disposes of real and personal property of more than $1,250,000 in value, almost all of which is in Oregon. Its probate is contested on the ground, as claimed, that the court of primary jurisdiction is the superior court of Los Angeles County,

Cal., in which state the contestants allege that the testatrix was domiciled at the time of her death. Mr. and Mrs. Reed came to Oregon in 1854, and remained here until 1892, during which time they accumulated the fortune now in controversy. Mr. Reed's health failed in 1891, and at the instance and upon the advice of his physician he went to California to spend the winter, hoping the change would benefit him. His health not improving, he returned to Oregon in the spring of 1892, and then went to Europe to consult a specialist. He returned from Europe in the fall, and shortly thereafter he and his wife went to Pasadena, California, where the climate was considered better suited to his health and comfort than that of Oregon. They boarded a while at a hotel, and then purchased residence property, and removed their household effects and personal belongings from Portland to Pasadena. Mr. Reed's health growing worse, he died in Pasadena in 1895, and Mrs. Reed brought the body to Portland, where it was buried in Riverview Cemetery. During his absence from Portland, Mr. Reed made no material change in his business affairs, retained his residence property and large holdings in lands and city property and his investments and securities in this state, kept his bank account and deposits, his office and agent here to attend to his business. He also retained his connection as a director in several Oregon corporations, and his position as a member of the Water Committee of Portland and his fraternal affiliations. He never voted in California, nor assumed any of the duties and obligations of its citizenship. The taxes on his personal property, except, perhaps, such as he used for his immediate comfort and convenience, were paid in Portland and not in California. Save and except his bare residence in Pasadena, Portland was the center of his affairs, and they remained unchanged as to his business connection and civic obligations and duties. Mr. Reed left a will devising and bequeathing all his property, except some real estate in Massachusetts, to his wife, and suggested therein:

"Feeling as I do a deep interest in the future welfare and prosperity of the City of Portland, Oregon, where I have spent my business life and accumulated the property I possess, I would suggest to my wife that she devote some portion of my estate

to benevolent objects or to the cultivation, illustration or development of the fine arts of said City of Portland, or to some other suitable purpose, which shall be of permanent value and contribute to the beauty of the city and to the intelligence, prosperity and happines of its inhabitants."

On November 18, 1895, Mrs. Reed petitioned the probate court of Multnomah County for administration upon the estate of her husband, reciting and stating in such petition that she was a resident of Portland. She was appointed executrix, and thereafter settled up the estate. She returned to California, and for a time lived in the residence formerly occupied by herself and husband. Some two or three years later she built a dwelling at Carmelita, Pasadena, on property purchased by her husband, and on which he had contemplated building. She continued to reside there until her death, making frequent visits to Portland. She made no change in the management of the business or the property, real or personal, to which she succeeded, except to have her husband's name removed from the office door and hers placed thereon. She retained her church connection in Portland, and made regular contributions for its support and to its charities. She kept her office, agent, bank account and deposits there, except a small amount from time to time to meet her current expenses. She made no investments in California out of her surplus proceeds, but retained her property interests and busines of all kinds in Oregon as had been done by her husband. In numerous and sundry documents executed by her she declared herself to be a resident of Oregon temporarily residing in Pasadena, and in her will, which was several times changed and revised, she invariably made the same declaration of herself. By the terms of her will, after making bequests to divers persons amounting to $230,000 and disposing of several small articles of personal property, she devised and bequeathed the remainder of her property for some 17 different charitable and literary purposes, the recipients of her bounty all being Portland institutions except three, and only one of them was in Pasadena. The bulk of her property was devoted to the founding and maintenance at Portland "of an institution of learning, having for its object the increase and diffusion of practical

knowledge among the citizens of said City of Portland, and for-
the promotion of literature, science and art," to be known as
the "Reed Institute," in memory of her husband. She appointed
a resident of Portland executor of her will, and residents of that
city trustees to carry out its objects. The court below held that
the legal domicile of Mrs. Reed was in Oregon at the time of
her death, and her will was entitled to probate here. From this
decree the contestants appeal.                    AFFIRMED.

For appellants there was a brief with oral arguments by *Mr.
William Montgomery Gregory* and *Mr. James A. Gibson.*

For respondents there was a brief over the names of *Dolph,
Mallory, Simon & Gearin, William P. Lord, Martin Luther
Pipes* and *Stewart, Eliot & Williams,* with oral arguments by
*Mr. Joseph Simon, Mr. Lord* and *Mr. Pipes.*

MR. CHIEF JUSTICE BEAN delivered the opinion.

1. This contest arises out of the desire of a number of the
heirs of Mrs. Reed to divert and circumvent her manifest inten-
tion and desire as to the disposition of her property by availing
themselves of the provisions of a statute of California which
makes void any devise or bequest for charitable uses in excess
of a certain proportionate share of the estate of the deceased:
2 Kerr, Cyc. Code, § 1313. To accomplish this purpose they
assert that Mrs. Reed was domiciled in California, and the dis-
position of her property was subject to its laws. The case, there-
fore, depends upon the single fact whether Mrs. Reed's domicile
at the time of her death was in Oregon or in California. To
make out their case, the contestants are bound to establish, either
(1) that Mr. Reed changed his domicile, and by virtue of the
marital relation, the domicile of Mrs. Reed, from Portland to
Pasadena; or (2) that, if his domicile remained at Portland
unchanged, Mrs. Reed, after his death, and when she became
competent to choose and acquire a new domicile, changed her
domicile from Portland to Pasadena. Domicile is difficult of
accurate definition and the opinion has been expressed by many
judges and writers that the term cannot be successfully defined
so as to embrace all its phases. Mr. Justice SHAW says: "No

exact definition can be given of domicile; it depends upon no one fact or combination of circumstances, but from the whole taken together it must be determined in each particular case:" *Thorndike* v. *Boston,* 1 Metc. (Mass.) 242. Vice Chancellor KINDERSLEY observes: "With respect to these questions of domicile, there is no precise definition of that word, or any formula laid down by the application of which to the facts of the case it is possible at once to say where the domicile may be:" *Cockrell* v. *Cockrell,* 25 L. J. Ch. (N. S.) 730, 731; *Cockrell* v. *Cockrell,* 2 Jur. (N. S.) 727. Lord Chancellor HATHERLEY declined to "add to the many ineffectual attempts to define" the term: *Udny* v. *Udny,* L. R. 1 Sc. & Div. App. 441, 449. Mr. Jacobs and Mr. Dicey have both devoted many pages to a discussion of domicile and they each point out the variety of attempts to define it, and how futile have been the efforts: Jacobs, Domicile, § 56 *et seq.;* Dicey, Conflict of Laws, p. 79.

"Domicile," strictly speaking, is the relation the law creates between an individual and a particular place or country, and each case is dependent upon its own particular facts. It is not in a legal sense synonymous with "residence." A person may have more than one residence and more than one home, in the ordinary acceptance of those terms, but he can have only one domicile and the law requires that for the purpose of the succession of his property he be domiciled somewhere. The word "home" is undoubtedly the fundamental idea of domicile, though calling a place "home" as a matter of fact may not be and often is not entitled to much weight: Jacobs, Domicile, § 72. To constitute domicile there must be both the fact of a fixed habitation or abode in a particular place, and an intention to remain there permanently or indefinitely; or, as Mr. Wharton says: "There must be: (1) residence, actual or inchoate; (2) the nonexistence of any intention to make a domicile elsewhere:" Wharton Conflict of Laws, § 21. Domicile, therefore, is made up of residence and intention. Neither, standing alone, is sufficient for the purpose. Residence is not enough, except as it is co-joined with intent, which determines whether its character is permanent or temporary; and clearly a mere intent cannot create a

domicile. Mr. Dicey says: "The domicile of any person is, in general, the place or country which is in fact his permanent home, but is in some cases the place or country which, whether in fact his home or not, is determined to be his home by a rule of law:" Dicey, Conflict of Laws, p. 79. This is considered by Mr. Jacobs, with, perhaps, one change, to be as nearly accurate a definition as has been given: Jacobs, Domicile, § 67.

2. But we need not pursue this branch of the question further. We are not so much concerned at this time with the correct technical definition of domicile as we are with the law regulating a change of domicile when once acquired. It is shown by the evidence and admitted by the contestants that Mr. and Mrs. Reed were domiciled in Oregon from 1854 to 1892—a periód of nearly 40 years—and this domicile is presumed to have continued until it is shown that a new one was established, in intent and in fact, by indicating and carrying into effect an intention to abandon the Oregon domicile, and to establish another in California. Every person is assumed by the law to have one domicile and one only. And when this is shown to exist; it is presumed to continue until not only another residence and place of abode are acquired, but until there is an intention manifested and carried into execution of abandoning the original domicile and acquiring another by actual residence; and the burden of proof is upon the party who asserts the change: 10 Am. & Eng. Enc. Law (2 ed.), 3b, p. 14; 3 Cyc. 865; *Caldwell* v. *Pollak,* 91 Ala. 353 (8 South. 546) ; *Dupuy* v. *Wurtz,* 53 N. Y. 556; *Ennis* v. *Smith,* 55 U. S. (14 How.) 400, 423 (14 L. Ed. 472) ; *Isham* v. *Gibbons,* 1 Bradf. (N. Y. Sur.) 69; *Aikman* v. *Aikman,* 3 Macq. 852, 877; *Wanzer Lamp Co.* v. *Woods,* 13 Ont. Pr. R. 511.

3. Now, the principal fact upon which the contestants rely to show a change of domicile was the removal of the Reeds from Portland to Pasadena in 1892, and the residence of Mr. Reed there until his death three years later and Mrs. Reed's residence thereafter until her death in 1904. But residence alone is not sufficient for the purpose. Residence and domicile are not interchangeable terms. Domicile embraces more than mere residence. Residence denotes a place of abode, whether temporary or perma-

nent; while domicile denotes a fixed and permanent home, and need not be the actual place of abode. It does not depend upon mere naked residence, but "is the legal, the juridical seat of every person—the seat where he is considered to be in the eyes of the law, for certain applications of the law, whether he be corporeally found there, or whether he be not found there:" Jacobs, Domicile, § 63. This distinction is clearly recognized in the authorities.

In *Drevon* v. *Drevon*, 34 L. J. (N. S.) Eq. 129, Vice Chancellor KINDERSLEY, who has considered the subject of domicile in a number of cases, says with much force: "For example, the first act generally brought forward, and, of course, which is brought forward and relied upon in this case, is length of residence. Length of residence has in many cases, both by English and by foreign jurists, been considered a very important ingredient in the question, and, in other cases, it has been considered as of little importance, that is, as compared with and brought into connection and contact with other circumstances, of which evidence is given in the case. I think, with regard to that point, the true conclusion is this, not that any one act or any one circumstance is necessarily *per se* of vast importance and other circumstances of little importance, but it is a question what is the relative importance of the different acts, whether some acts tending one way are of greater weight than those tending the other as to the *animus manendi* or the *animus revertendi,* or the animus as to changing domicile." And Lord CHELMSFORD says in *Moorhouse* v. *Lord,* 10 H. L. C. 272: "In a question of change of domicile the attention must not be too closely confined to the nature and character of the residence by which the new domicile is supposed to have been acquired. It may possibly be of such a description as to show an intention to abandon the former domicile; but that intention must be clearly and unequivocally proved."

So also in *Gilman* v. *Gilman,* 52 Me. 165 (83 Am. Dec. 502), the court say: "A person may have two places of residence, for purposes of business or pleasure. But, in regard to the succession of his property, as he must have a domicile somewhere,

so he can have only one. It is not very uncommon for wealthy merchants to have two dwelling-houses, one in the city and another in the country, or in two different cities, residing in each a part of the year. In such cases, looking at the domestic establishment merely, it might be difficult to determine whether the domicile was in one place, or the other. * * If any general rule can be applied to such cases, we think it is this: That the domicile of origin, or the previous domicile shall prevail. This is in accordance with the general doctrine, that the *forum origines* remains until a new one is acquired. And this would generally be in harmony with the other circumstances of each case." And, again, in *Tipton* v. *Tipton*, 87 Ky. 245 (8 S. W. 440), it is said: "There is a broad distinction between a legal and actual residence. A legal residence (domicle) cannot, in the nature of things coexist in the same person in two states or countries. He must have a legal residence somewhere. He cannot be a cosmopolitan. The succession of movable property, whether testamentary or in case of intestacy, except as regulated by statute, the jurisdiction of the probate of wills, the right to vote, the liability to poll tax, and to military duty, and other things, all depend upon the party's legal residence or domicile. For these purposes, he must have a legal residence. The law will, from facts and circumstances, fix a legal residence for him, unless he voluntarily fixes it himself. His legal residence consists of fact and intention. Both must concur. And when his legal residence is once fixed, it requires both fact and intention to change it. As contradistinguished from his legal residence, he may have an actual residence in another state or country. He may abide in the latter without surrendering his legal residence in the former, provided he so intends. His legal residence, for the purposes above indicated, may be merely ideal, but his actual residence must be substantive. He may not actually abide at his legal residence at all, but his actual residence must be his abiding place."

So, in *Long* v. *Ryan*, 30 Grat. 718, the court say: "There is, however, a wide distinction between domicile and residence recognized by the most approved authorities everywhere. 'Domicile'

is defined to be a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time. To constitute a domicile two things must concur—first, residence; secondly, the intention to remain there. Domicile, therefore, means more than residence. A man may be a resident of a particular locality without having his domicile there. He can have but one domicile at one and the same time, at least for the same purpose, although he may have several residences." And, again, in *Stout* v. *Leonard,* 37 N. J. Law, 492, it is said: "Residence is not domicile though domicile is the legal conception of residence. Domicile is. residence combined with intention. It has been well defined to be a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time. A man can have but one domicile for one and the same purpose at any one time, though he may have numerous places of residence. His place of residence may be, and most generally is, his place of domicile, but it obviously is not by any means necessarily so, for no length of residence without the intention of remaining will constitute domicile."

Other decisions might be referred to to the same effect, but these are sufficient to show the distinction between residence and domicile, and that mere change of residence is not of itself proof of a change of domicile unless accompanied by an intention, expressed or implied, to abandon the old domicile and acquire a new one. Within the principle of law declared in the decisions, a person may reside for pleasure or health in one place without forfeiting or surrendering his domicile or legal residence in another, if he so intends. It is not residence alone, but it is the intention of the person, expressed or implied from the facts in evidence, conjoined with residence, that determines domicile. Every person *sui juris* and capable of controlling his personal movements may change his domicile at pleasure, but a change of domicile involves intention as the dominant factor.

4. To constitute a change of domicile three things are essential: (1) Residence in another place; (2) an intention to abandon the old domicile; and (3) an intention of acquiring a new

one; or, as some writers express it, there must be an *animus non revertendi* and an *animus manendi* or *animus et factum*: *Berry v. Wilcox,* 44 Neb. 82 (62 N. W. 249, 48 Am. St. Rep. 706), *Hayes v. Hayes,* 74 Ill. 312, 316; *Jopp v. Wood,* 34 L. J. (N. S.) Eq. 212; *Moorhouse v. Lord,* 10 H. L. C. 272. The *factum* is the transfer of the bodily presence and the *animus* is the intention of residing permanently, or for an indefinite period. A change of domicile, therefore, involves a question of fact and intent. The fact is easily proved because it is shown by the mere transfer of the bodily presence from the old to the new place of abode, but the intent with which the change is made is to be determined from the character of the residence, its object and purpose, in connection with the other evidence in the case. Residence in a particular place is a fact obvious to the senses and cannot be easily mistaken, but its value in fixing domicile is unimportant unless accompanied with an intent of remaining permanently or indefinitely, or, as it is sometimes said, with no present intent of removing therefrom. Residence alone, however long continued, will not effect a change of domicile. On this point the authorities speak with practically one voice. In *Jopp v. Wood,* 4 DeG. J. & S. 616, TURNER, L. J., says: "Though the residence may be decisive as to the *factum,* it cannot, when looked at with reference to the *animus,* be regarded otherwise than as an equivocal act. The mere fact of a man residing in a place different from that in which he had been before domiciled, even though his residence there may be long and continuous does not of necessity show that he has elected that place as his permanent and abiding home. He may have taken up and continued his residence there for some special purpose, or he may have elected to make the place his temporary home." And Mr. Justice RAPALLO says in *Dupuy v. Wurtz,* 53 N. Y. 556, 561: "One leading rule is that for the purposes of succession every person must have a domicile somewhere, and can have but one domicile, and that the domicile of origin is presumed to continue until a new one is acquired. * * To effect a change of domicile for the purpose of succession there must be not only a change of residence, but an intention to

abandon the former domicile, and acquire another as the sole domicile. There must be both residence in the alleged adopted domicile, and an intention to adopt such place of residence as the sole domicile. Residence alone has no effect *per se,* though it may be most important, as a ground from which to infer intention. Length of residence will not alone effect the change. Intention alone will not do it, but the two taken together do constitute a change of domicile."

The animus or intent is, therefore, as essential to a change of domicile as the fact of residence. To lose a domicile when once acquired, there must be an intention to do so. A mere change of the place of abode, however long continued, is not sufficient, unless the proper animus or intention is present. This intention, it is true, may be inferred from circumstances, and the residence may be of such a character and accompanied by such indices of a permanent home that the law will apply to the facts a result contrary to the actual intention of the party. Thus one cannot make a permanent fixed commercial residence with all the surroundings of a permanent home in one place and a domicile in another by a mere mental act. But a residence for mere pleasure or health is not regarded as of any great weight in determining the question of a change of domicile, for, in such case it is just as likely that the party intends to retain as to abandon his present domicile. The books abound in cases where absences for 20, 30 and even 40 years effect no change of domicile. *White* v. *Brown,* 1 Wall. C. C. 217 (Fed. Cas. No. 17,538) ; *Re Domingo Capdevielle,* 10 Jur. 1155; *Jopp* v. *Wood,* 4 DeG. J. & S. 616; *Hodgson* v. *Beauchesne,* 12 P. C. 285; *Cruger* v. *Phelps,* 21 Misc. Rep. 252 (47 N. Y. Supp. 61). And Sir John Dodson says in *Bremer* v. *Freeman,* 10 Moore, P. C. 306 : "A person may live 50 years in a place, and not acquire a domicile, for he may have had all the time an intention to return to his own country." And Mr. Jacobs says : "Residence of itself, although decisive of the *factum* necessary for a change of domicile, is decisive of nothing further, and even when long continued, although *per se* evidence of intention will not supply its place. * * Intention must concur with fact,

and must clearly appear. On the one hand, the shortest residence is sufficient if the requisite animus be present, and, on the other, the longest will not suffice if it be absent·:" Jacobs, Domicile, § 136.

The residence of Mr. and Mrs. Reed at Pasadena admittedly was for health and pleasure, and not business. It was, therefore, not of that permanent commercial or business character which will in law constitute a change of domicile regardless of the intention of the parties. Nor was it of such a character as will overcome the presumption that their former domicile at Portland continued. We must, therefore, look to the evidence to ascertain whether in fact they intended to abandon their Portland domicile and acquire a new one in California, and in doing so it is important to bear in mind their situation at the time of their removal, the causes which prompted it, its purpose and the place to which they removed. Mr. Reed was in failing health and had been compelled to cease active participation in his business affairs. It was necessary, as he thought, and as he was advised by his physicians, to seek a more congenial climate than that of Oregon. For this purpose he visited California, and after examining several places or localities, finally selected Pasadena, which, as one of the witnesses testified, is "a health resort." A large part of its population "come there and away again; two-thirds of it was temporary." "The temporary class is composed largely of people who come in search of health." To this character of a location Mr. and Mrs. Reed moved, because its climatic conditions and general surroundings would, it was thought, conduce to their personal comfort and the improvement of Mr. Reed's health. They did not make any investments in Pasadena except such as seemed to them necessary for their comfort and pleasure. Mr. Reed did not dispose of his Portland property, or make any change in his business affairs. He retained his office and bank account in Portland, and his entire conduct negatives an intention to abandon his Portland domicile or to acquire another. Mr. Reed's health did not improve, and he died in 1895, devising and bequeathing his property to his wife. Mrs. Reed con-

tinued to reside in Pasadena as before, without making any change in her business affairs or indicating in any way a purpose to change her domicile. She continued her church connection in Portland, making regular contributions for its support and to its charities. She described herself in numerous documents and in her will as a resident of Portland temporarily residing at Pasadena, and the very terms of the will itself indicate that she considered Portland as her home, and entitled to receive her charitable bequests. The acts of Mr. and Mrs. Reed, and the undisputed facts surrounding and characterizing their removal from Portland to California, and their subsequent residence in Pasadena, show to our minds quite clearly that they at all times deemed and considered their residence there as temporary rather than permanent, and that Portland was their legal domicile. The decided weight of the testimony as to their purposes as declared by them is to the same effect.

Mr. C. A. Dolph, who was the legal and confidential adviser of Mrs. Reed after the death of her husband, and who, perhaps, had a better opportunity to know her real intention than any other witness in the case, testified that he had numerous conversations with Mrs. Reed regarding the place of her permanent residence and that on every occasion when the subject came up she invariably gave it as Portland, and by her instructions she had been so described in the different wills that he had prepared for her; that when he came to prepare the petition for the probate of Mr. Reed's will in November, 1895, he inquired of Mrs. Reed as to her permanent residence because she was to verify the petition, and he knew Mr. Reed had been away from Portland a good deal for several years prior to his death, and at that time Mrs. Reed told him distinctly that Portland was their permanent residence and that

"They had always claimed Portland as their home, that the matter had been incidentally discussed with relation to the removal or change of residence of Captains Thompson and Ainsworth, Mr. Reed had spoken of that, and stated that their permanent home was in Oregon."

He further testified that he frequently visited Mrs. Reed at Pasadena professionally at her request, and on several occasions

suggested that it might be better for her to consult some resident lawyer and offered to recommend some one for that purpose, but that she invariably replied:

" 'I don't wish to do that. It is so hard to make people here understand that I do not belong here.   My interests, what I have, my affections'—I would not be sure that she said my home —but that was the significance of it, was in Oregon and not in California."

He had many conversations with her with regard to the disposition on the part of the people of Pasadena to induce her to aid in public charities and enterprises, and that on more than one occasion she told him that

"They did not understand that she was not interested in those things, not belonging to them, or not belonging there, but in Oregon.   She put California, or Pasadena, and Portland, Oregon, in juxtaposition a good many times and principally in urging her objection to having an adviser there, and transferring a portion of her business there, and it came up in regard to her bank account, as to having a bank account or an office there, she always answered that her office was here and her business was here, and her affections were here."

He also says that she always spoke of Oregon as her home, and so far as her intentions were concerned he never had a suspicion that it was claimed by anybody that Portland was not her permanent home; that every expression of hers to him, whether drawn out for the purpose of obtaining information from a legal standpoint, or in a social way, was to that effect.

Mr. James Patterson, a resident of Pasadena, who became acquainted with and frequently visited the Reeds after their removal to that city, testified that Mr. Reed was regarded as a temporary resident, and that he came to Pasadena for his health; that after Mr. Reed's death Mrs. Reed frequently referred to Oregon as her home, and that on one occasion he suggested to her that she had lived in Pasadena long enough to become a Californian and she replied: "Oh, no! I will never become a Californian.   Oregon is my home.   I was raised there and grew up with the country."   Miss Stevens ,who was the maid of Mrs. Reed from January, 1900, to October, 1902, testified that Mrs. Reed always spoke of Portland as her home, and

(48th  Or.—33)

when they were planning to make visits to Oregon as they frequently did, Mrs. Reed would say: "Well, we are going home this summer"; that in April, 1904, she told witness that her physician thought that the climate at Pasadena did not agree with her, and that it might be necessary for her to make a change, and she said: "If so, I will go back to my home in Portland."

Mrs. Martin Winch, who was regarded practically as a daughter by Mrs. Reed, and with whom she talked frankly and freely, testified that the Reeds went to California on account of Mr. Reed's health; that after Mr. Reed's death she (witness) was with Mrs. Reed practically all the time up to her death except during the summers of 1900 and 1903; that witness always understood that Mrs. Reed's permanent home was in Portland, and never thought anything else; that Mrs. Reed always kept up her dues in the Ladies' Relief Society and in the Unitarian Church of which she remained a member, and when solicited to contribute to Pasadena charities, she would say: "That is not my church. My church is in Portland. I give to my church just as I always did"; that Mrs. Reed loved Carmelita dearly but always spoke of it as Carmelita, and witness never heard her refer to it as home; that witness never heard her in any shape or manner say that Pasadena was her home for the rest of her life or all the time, but often heard her refer to Portland as her home; that she often talked about California and Oregon people, and witness had frequently heard her say that the people of Pasadena did not seem to understand why she would not take the same interest in their charities and social affairs as she did in Portland, but she said: "That I do not do. Portland is my home. That is where I am interested, and what I want to do I want to do there"; that when people would come to her in Pasadena and solicit contributions she would say: "Why, I have no business here. My business, my office is in Portland and my business agent is there"; and that so far as witness knew Portland is the place she always spoke of as her permanent home. Mr. Martin Winch, a nephew of Mrs. Reed and her confidential agent and business manager, and that of her husband during the latter part of his life, and who, consequently, was

familiar with her intentions, testified that he always looked upon Mrs. Reed's residence in California as temporary, and thought that she regarded it the same; that he never heard anything to the contrary, and never supposed that she had any permanent residence but Portland.

The contestants have the testimony of numerous witnesses as to alleged declarations made by Mrs. Reed concerning her home and some letters written by her to relatives and friends. In many of these letters Mrs. Reed expresses her appreciation of the climate of Pasadena, its flowers and fruits, and in some of them refers to Carmelita as home, but there is nothing in any of them to indicate that she used the word "home" in any other sense than as referring to a temporary residence. It is not necessary to cite authorities or enter into an argument to show that the word "home" is very frequently used with reference to a place other than the legal and permanent domicile, but it would be quite natural for Mrs. Reed, who manifestly enjoyed her beautiful residence in Pasadena, to refer to it as her home in a casual conversation and in friendly letters. The oral testimony consists principally of the evidence of interested witnesses who undertake to relate statements alleged to have been made by both Mr. and Mrs. Reed to the effect that they never intended to return to Portland to live; that Pasadena was their home, and that they expected to live there during the remainder of their lives. It is not necessary to prolong the opinion by referring to this evidence in detail. We have read it with care. The declarations, or most of them, are claimed to have been made many years ago, and in the course of casual conversations, or in answer to questions, and are entitled to but little weight. Such testimony is admissible in cases of this character, but it is considered by courts as of the lowest species of evidence, especially when, as in this case, it encounters conflicting declarations. Such expressions or declarations are so much influenced by the circumstances under which and the person to whom they are made, and the state of the temper at the time, that they cannot be safely relied upon when they conflict with each other, or are inconsistent with the actions and conduct of the parties.

5. In *Moorhouse* v. *Lord,* LORD CHELMSFORD, in referring to similar evidence, said: "There are proved on this occasion, as there usually are in such cases, written and oral declarations which conflict with each other. I lay no great stress, as your Lordships probably would not incline to do, upon casual expressions of preference for one country over another at different periods. The feelings at the moment may dictate them, or the changing circumstances of life; even a change of weather, the difference between a bright and gloomy day, may make all the difference in the expression of attachment to one place or to another; but I do lay very considerable stress upon declarations made to parties to whom he would be likely to reveal his intentions, those declarations not being casual and occasional, but repeated from time to time, and evincing a strong determination to carry into effect the objects which he states." And Mr. Jacobs, in speaking of the weight to be given to the oral declarations of a party, says: "The time, occasion and manner of making them, their reasonableness and consistency with themselves and with the other proven facts in the case, the presence or absence of the suspicion of sinister purpose in making them, the character and temper of the person, as well as (if they are oral) the length of time which has elapsed between the time of their alleged utterance and the time when they are testified to, etc., enter materially into the estimation of their value. If they are not inconsistent with the acts, and are faithfully reported, they often serve to turn the scale; but it is otherwise, if they are contradicted by the acts and general conduct of the person making them. The peevish outburst of a person of irascible temper, or the careless expression of one whose habits are unstable and whose purposes are vacillating, are entitled to less weight than the deliberate utterances of a person of known firmness of character. So, too, expressions in conversations are of less value than repeated declarations made to proper persons or declarations in the usual course of business. Mere declarations that a person prefers a residence in one country to another, it has been said, will not be regarded by a court, except in a nicely balanced case:" Jacobs, Domicile, § 455.

Within the rules thus laid down, the declarations and statements made by Mrs. Reed to the witnesses for the proponents are manifestly entitled to more weight than those made to the witnesses for contestants. Mrs. Reed's relation to them was such as made them proper persons in whom to confide and with whom to converse frankly with regard to her affairs, and to whom she would be likely to reveal her intentions. Mr. Dolph was her legal adviser and friend of long standing, a man to whom she would naturally discose her real purpose and intent and especially so when it was necessary for him to be informed in regard to that matter in order to advise her intelligently and safely in her business affairs. Mrs. Winch was to her as a daughter with whom she talked freely and frankly. Mr. Winch was her nephew and business agent and would certainly have known of any intent on her part or that of her husband to change their domicile from Portland to California, and yet he testified that he never knew or heard of any contemplated change. Mr. Patterson was a friend, and Miss Stevens was her maid. These witnesses were all in positions to know more of Mrs. Reed's intent and purpose than other witnesses in the case. They are all disinterested, without any object to gain or purpose to advance by exaggeration or distorting the truth. Indeed, Mr. Winch, who is a nephew of Mrs. Reed and one of the legatees in the will, would find his interest largely increased if the contestants could succeed.

The time, occasion and manner of making the declarations to these witnesses, the fact that such declarations were frequently repeated and always consistent with each other and with the solemn declarations made by her in her several wills and written instruments, strongly corroborate the inference as to residence to be drawn from Mrs. Reed's acts and conduct. They were not expressions let drop in mere casual conversations or contained in friendly letters, but, as said by CHASE, J., in *Cruger* v. *Phelps* (Sup.) 47 N. Y. Supp. 61: "Were made when there was no controversy, and cover such a long period of time as to preclude the idea of their being made with reference to property rights, and they were so deliberately and

frequently made as to preclude the idea of carelessness or inadvertence." They are circumstances which, with the deliberate acts of Mrs. Reed, indicate clearly that her intention was to retain her domicile in Portland and to dispose of her property according to the laws of this state, and the showing made by the contestants is not such as to require a court to defeat her expressed desires as to the devolution of her property by holding that her domicile was not where she supposed and intended it to be.

The decree is affirmed.                                    AFFIRMED.