In the Matter of the Estate of JOHN E. ANDRUS, Deceased.

Surrogate's Court, Westchester County, July 2, 1935.

*Thomas B. Gilchrist*, special guardian for infant petitioner, Vincent Dyckman Andrus.

*Cadwalader, Wickersham & Taft [Catherine Noyes Lee* and *Hampton D. Ewing, Jr.,* of counsel], for the petitioner, Helen Andrus Pinkham, as general guardian of Vincent Dyckman Andrus, an infant beneficiary.

*Larkin, Rathbone & Perry [John M. Perry* and *Albert B. Maginnes* of counsel], for Helen W. Benedict and others, as executors.

*Eidlitz, French & Sullivan [Harry N. French* and *Richard P. Prowell, Jr.,* of counsel], for Dorothy Bourne Andrus and another, trust beneficiaries.

*Frederick M. Davenport, Jr.,* for Edith J. Davenport and others, trust beneficiaries.

*Daniel J. Cashin,* for Surdna Foundation, a corporation.

*Robert P. Smith,* special guardian for Julia Dyckman Andrus and others.

*Charles H. Griffiths,* special guardian for Elizabeth Brayton Andrus and others.

SLATER, S. The applications by Vincent Dyckman Andrus, an infant nineteen years of age, and by one of his general guardians, are for the construction of articles fourth, fifth and sixth of the will and a determination as to the validity or effect of its provisions, particularly the provision which imposes a condition upon the right of the infant, as well as other beneficiaries, who receive the benefits given to them in said will.

John E. Andrus died on December 26, 1934, aged ninety-three years, leaving a will dated December 8, 1924. Mr. Andrus had published three codicils to his will, dated May 17, 1926, May 26, 1927, and March 24, 1930, respectively, changing the personnel of the executors and trustees, but making no other changes. By the third codicil The New Jersey Title Guarantee and Trust Company of Jersey City, N. J., was substituted in place of the Central Union Trust Company of New York. The will and codicils were probated March 6, 1935.

By the terms of article fourth of the will he gave his residuary estate to the Central Union Trust Company (The New Jersey Title Guarantee and Trust Company being substituted by codicil), William H. Taylor (Helen W. Benedict being substituted by codicil), and A. Newell Benedict (Frank B. Smith being added by a codicil), in trust, to hold during the lives of Julia Dyckman Andrus and John E. Andrus, two of decedent's grandchildren, and the

survivor of them, to receive the rents, issues and profits, and to divide the net income into one hundred parts and to pay the same as directed by said article as follows:

" Forty-five (45) parts thereof to Surdna Foundation, Inc., a corporation organized and existing under the laws of the State of New York.

" Nine (9) parts to my son, John E. Andrus, Jr.

" Nine (9) parts to my son, Hamlin F. Andrus.

" Seven (7) parts to my daughter, Mary D. Taylor.

" Seven (7) parts to my daughter, Edith J. Davenport.

" Seven (7) parts to my daughter, Margaret Thorpe.

" Seven (7) parts to my daughter, Ida B. Williams.

" Seven (7) parts to my daughter, Helen W. Benedict.

" One-half (1/2) part to my granddaughter, Dorothy Andrus, daughter of my late son, William L. Andrus:

" One-half (1/2) part to my granddaughter, Helen Andrus, daughter of my late son, William L. Andrus.

" One (1) part to my grandson, Vincent Andrus, son of my late son, William L. Andrus.

" If any of my children or grandchildren last above named shall die before me, or before the termination of the trust hereby created, then, in the event of each such death, upon his, her or their death, I direct the Trustees to pay the income which he, she or they would have received if living, during the continuation of the trust, to the children of the person so dying who shall survive the person so dying, and the descendants then living of any child of the person so dying who shall have died before him or her leaving descendants, *per stirpes* and not *per capita;* and if any such last referred to grandchild or descendant so receiving the income, die before the termination of the trust, to pay during the continuation of the trust, the share of such income which he, she or they were receiving at the time of death, to his, her or their descendants, *per stirpes* and not *per capita:* and in default of such descendants, or upon their death during the continuation of the trust, to add the amount of such income to the then share of those participating in the income which my first mentioned child or grandchild, dying as aforesaid, would have received if living, and pay the same to them, *per stirpes;* and if it should eventuate that there be no such persons in being to receive such income, then, during the continuation of the trust, to pay such income to all the individuals who are then receiving income from the trust estate, in the proportions which they would have received the same had each of the fifty-five (55) parts of income disposed of to such individuals been augmented proportionately by the number of shares allotted to any child or grandchild first

mentioned in this paragraph so dying, or whose direct line of descent shall have become extinct as aforesaid. As for example, if my son, John E. Andrus, Jr., should die before me or before the termination of the trust without leaving children or descendants him surviving, his brother Hamlin, if living, or if deceased, the children or descendants of Hamlin, would, in addition to the nine fifty-fifths (9/55) herein provided, receive nine forty-sixths (9/46) of the share which John or his children or descendants were receiving and so on as to the other beneficiaries, this being the method I prescribed for distribution under the trust agreements hereinafter mentioned.

" I hereby direct, and it is my intention, that this same method shall apply to and be used in making the disposition of the share, both of income and principal, of any beneficiary who shall fail or refuse to comply with the conditions contained in the Section of this Will designated ' Sixth.' "

The fifth article of the will confers by reference upon the trustees all the powers in relation to the *disposition, administration and investment* of the capital that were given by two certain trust agreements, dated December 30, 1921, and December 29, 1922, respectively. Said article is as follows:

" *Fifth.* I hereby authorize and empower my Trustees to hold, sell, mortgage, exchange, lease, dispose of, invest, reinvest, manage, operate and control the principal of the trust property in whatever form the same may at any time be during the continuation of the trust as fully and freely as I could have managed and disposed of the same if living, without regard to any restrictions to which trustees are ordinarily subject, statutory or otherwise. Without in any way limiting the power and discretion thus conferred, but as indicating some, but not all of the powers with which they are hereby vested (and this enumeration shall not be construed as a definition or limitation of power) my Trustees are empowered among other things, in their discretion to hold and to continue to hold all or any part of the trust property as long as they think proper in the form in which they received it, or at any time or times to sell, transfer, assign, convey, mortgage, exchange or lease for any number of years during or beyond the trust period, all or any part of the trust property, and in connection with any of the foregoing or otherwise to make covenants of renewal or renewals for any number of years during or beyond the trust period, and make any other covenants, conditions or terms which the said Trustees may deem proper. Any sales that may be made by them at any time may either be at public or private sale, for cash or on credit, or partly for cash and partly for credit, in their absolute discretion;

and they may make, execute and deliver all documents necessary, proper or desirable to accomplish the execution and completion of the exercise of any powers, intending by the provision of this section to confer, and I do hereby confer upon my Trustees all the powers in connection with the disposition, administration and investment of the capital of the trust hereby created which I conferred upon the Trustees under two certain trust agreements which I made, one dated December 30, 1921, wherein Central Union Trust Company of New York, Hamlin F. Andrus and William L. Andrus were named as trustees, and one dated December 29, 1922, wherein Central Union Trust Company of New York, Hamlin F. Andrus and William H. Taylor were named as trustees, it being my intention and desire that the trustees under said trusts and the trustees under this my Will, shall, so far as legally possible, have the power to cooperate and act coextensively and in harmony in the administration and disposition of the property which I disposed of by said trust agreements and the property of which I dispose in trust by the terms of this Will, and if the question should ever arise as to whether the trustees hereunder had or had not the right or power to do any act or thing in relation to the trust property, it is my intention that said question shall always be resolved in favor of the trustees possessing the power they desire to exercise. Whenever in this Will, I have used the words ' trust property,' ' capital of the trust,' ' principal of the trust ' or ' trust estate ' (without implication of time) I mean the absolute fee, title and ownership of the trust property, real or personal.

" If at any time in the management of the trust created hereunder there shall arise any difference of opinion among the Trustees in connection with or in relation to the exercise of any rights or the discharge of any duties hereby imposed, the judgment and opinion of the majority of the Trustees shall prevail, provided that the corporate Trustee shall always constitute one of the majority whose judgment and opinion shall thus prevail, and any action taken by such majority shall be and shall be deemed to be the action of all the Trustees."

Article sixth of the will, the validity and effect of which is questioned because of the condition imposed upon the beneficiaries, is as follows:

" *Sixth.* The administration of the assets, capital and income of the said trusts created by the two trust agreements hereinbefore referred to has embraced a large amount of property and a great number of transactions, and as I have been kept informed of such administration, and am completely satisfied therewith, I desire that all which has been done and all the acts which have been taken by

the Trustees thereunder, and their successors, and by each and every one of them in the administration of said trusts, and each of them, shall be acquiesced in, ratified and confirmed by the said legatees, devisees and beneficiaries named in this my Will and by each and every of them; and I do declare and direct (and all the disposition of my property by this Will I make subject to this condition) that all devises, bequests, benefits and gifts provided for herein are and shall (in addition to such other limitations and conditions as are herein contained) be, and I hereby give, devise and bequeath the same, upon the further specific condition that each and every of the beneficiaries herein named to receive any part of my estate, directly or indirectly, immediately or at any time after my death, shall by a writing in form satisfactory to my Executors and/or Trustees, duly executed and acknowledged and filed with my Executors and/or Trustees, (and within a time to be specified by my said Executors and/or Trustees) respectively acquiesce in the administration of said trusts and each of them, and approve, ratify and confirm all acts and things done by the respective Trustees thereunder and their successors and each and every of them with respect to the administration of the trust properties under both or either of said trust agreements and the income therefrom. Such consent, when required of an infant, may be given by his or her duly appointed guardian, and if not so given, the gift, devise or bequest in respect of which it is required shall be void in the same manner as herein provided as if he or she should have been an adult and failed to give such consent. In the event of the failure or refusal of any of the said legatees, devisees and beneficiaries to comply with the conditions above set out, the devises and bequests or gifts to the persons and/or corporations so failing or refusing compliance with said conditions are hereby revoked and annulled, and the property (principal and income) disposed of by such devises, bequests and gifts, shall go to the said legatees devisees and beneficiaries other than Surdna Foundation, Inc., who shall comply with the said conditions as an increase and augmentation of the devises, bequests, benefits and gifts to them, in the proportions and according to the method of disposition provided for in section ' fourth ' hereof, and illustrated therein, and I give, devise and bequeath the same accordingly."

Letters testamentary were issued on March 6, 1935, to Helen W. Benedict, A. Newell Benedict, Frank B. Smith and The New Jersey Title Guarantee and Trust Company, Jersey City, N. J. The decree directing the issuance of letters contained a clause stating that " the said Executors shall, subject to the further order of this Court, keep the certificates of all stocks, bonds, evidences of indebt-

edness and all other personal property of this estate within the State of New York." On this same date an order was entered staying the executors from "making any demand or taking any action under article sixth of the will of said deceased which may in any way require or call upon the said Vincent Dyckman Andrus or his guardians, or any other person named in said will, to acquiesce in the administration of the trusts created by the said John E. Andrus by the certain Trust Agreements executed by him and dated respectively December 30, 1921, and December 29, 1922, or to approve, ratify or confirm any of the acts or things done by the respective trustees of said trusts or their successors;" awaiting the determination of the validity of the condition imposed in said paragraph sixth.

Letters of trusteeship were issued on May 8, 1935, to A. Newell Benedict, Helen W. Benedict, Frank B. Smith and The New Jersey Title Guarantee and Trust Company, Jersey City, N. J., containing the clause that all property shall be kept in the State of New York.

The Central Hanover Bank and Trust Company of New York and Helen Andrus Pinkham are acting as general guardians of the property of the infant petitioner under letters issued in the New York County Surrogate's Court on July 29, 1922.

Prior to the making of the will in 1924, John E. Andrus had made two certain *inter vivos* trust agreements, the first dated December 30, 1921, and the other dated December 29, 1922, whereby he disposed of vast properties. The two trusts were laid upon the lives of certain named grandchildren and are for the benefit of members of his family, as well as a charitable corporation theretofore created by him. The trust deeds give to the trustees therein named certain powers in connection with the disposition, administration and investment of the funds of the trust. In each of the trust instruments the Central Union Trust Company of New York, later known as the Central Hanover Bank and Trust Company, with others, were named as trustees.

The special guardians, Robert P. Smith and Charles H. Griffiths, raise the following question:

*First.* On the termination of the trust the trustees are directed to assign forty-five per cent of the capital of the trust *as it shall then exist* to Surdna Foundation, Inc., a charitable corporation. Does this gift for the charitable corporation offend section 17 of the Decedent Estate Law?

The petitioners, the above-named special guardians, and other respondents raise further questions:

*Second.* Article sixth of the will requires the infant, as well as the other beneficiaries, to acquiesce in ratifying and confirming by

writing in form satisfactory to the executors and trustees named in the will, the administration of the two *inter vivos* trusts hereinbefore referred to, and to approve all acts and things done by the respective trustees with respect to the administration of said trusts under both or either of said trust agreements, and the income therefrom. It is contended by the petitioner and the special guardians that article sixth of the will is void as against the public policy of the State of New York.

*Third.* That article sixth of the will is void as to the petitioner Vincent Dyckman Andrus, and other possible infants, because of his infancy, and the possible infancy of future beneficiaries.

*Fourth.* That article sixth of the will violates the public policy of the State, as it permits unlawful accumulations.

The petitioner and other respondents contend:

*Fifth.* That the provisions of article fifth which give to the testamentary trustees under the will of John E. Andrus the same power and authority in connection with the disposition, administration and investment of the capital of the trust conferred by the two *inter vivos* trusts involve an invalid incorporation by reference.

The first question is academic at this time, and there will be no gainful end served by its discussion or decision. As the trust is founded upon the lives of two children who are now about twenty years of age, probably a long term awaits the trust, during which time many changes may occur in the value of properties and in laws. The answer may well be held in abeyance.

The second objection possesses novelty and importance. It becomes my interpretive function to make decision in this virgin field. The task of " judging between man and the State " is undertaken.

The irrevocable *inter vivos* trusts created by John E. Andrus in his lifetime antedated the publication of the will. The value of the corpus of each trust is much in excess of $10,000,000. The first trust dealt with real property in varying forms, such as a gold mine, city hotel, office buildings, theatres, docks, timberland, water mill power rights, and mineral rights, located in several of the States. The second trust dealt with securities, interests in land syndicates, mortgages, and property of other like character.

The trustees proceeded with the administration of the two trust estates under the guidance of Mr. Andrus. There are now pending two actions in the Supreme Court of the county of New York for the judicial settlement of the accounts of the trustees. The infant petitioner herein is one of the life beneficiaries under the two deeds of trust and has a remainder interest in the principal of the trust estates, subject to being divested if he dies before the termination.

of the trust. The petitioner and his two sisters stand in place of their deceased father, William L. Andrus. The account of proceedings may necessarily involve questions relating to the adjustments between capital and income and numerous transactions by the trustees with respect to sales and conveyances and changes in the investments of the trust estates, all affecting the property rights of the beneficiary.

So much for the present; the future conduct of the trusts is an unknown and unknowable quantity.

Article sixth requires the beneficiaries to acquiesce in ratifying and confirming, by writing in form satisfactory to the executors and trustees named in the will, within a time named by them, the administration of the property mentioned in the deeds of trust and all acts and things done by them with respect to the *administration* of the trust properties. Such acquiescence is also demanded of infants and, in the event of the failure or refusal to comply with the condition to ratify and confirm, the gifts are revoked and annulled and the property given is to go to the other complying beneficiaries, other than Surdna Foundation, Inc. The deeds of trust are free from the restraint of a condition subsequent in the nature of an *in terrorem* clause. The pursuit of counsel has failed to reveal in this country, or in England, a case containing so drastic an *in terrorem* provision, or one dealing with the administration of an estate.

The *inter vivos* trust agreements, as well as the will as first executed, named the same corporate fiduciary as one of the trustees. Such corporate trustee remains as such in the *inter vivos* trusts, but no longer as a trustee of the will, because, on March 24, 1930, the testator made a change in the corporate trustee named in his will and appointed The New Jersey Title Guarantee and Trust Company, a New Jersey corporation, in its place and stead.

The executors say, through brief of counsel, that, at the time the will was executed, the petitioner was " *vested with the right,* if and when occasion should arise, to object to the acts of the Trustees under the *inter vivos* trust which he thought illegal and which resulted to his detriment. This may be regarded in the nature of a property right vested in the petitioner." The executors then contend that, upon the execution of the will, Mr. Andrus in effect said: " I recognize that you have a *property right* to object to the acts and things done by the Trustees under the *inter vivos* trust, but I will let you participate in my estate only if you waive that right and approve the accounts of the Trustees." The executors continue to say: " In other words, the testator was requiring the petitioner as a condition to participate in his estate to give up a

vested right " and claim that Mr. Andrus was well within his legal rights in doing this.

The executors further contend that the language of article sixth contemplated a condition precedent, or a conditional legacy, as distinguished from a condition subsequent.

The distinctions between, with examples of, conditions precedent and subsequent are set out in 2 Jarman on Wills ([6th Am. ed.] *842, and subsequent pages) and in 1 Roper on Legacies ([4th ed.] p. 749). The performance of the condition herein does not precede the vesting of the estate. It is not a condition of its *acquisition* or retention. The beneficiaries enjoy a vested property right. The condition was intended to defeat such vested interest. Conditions subsequent are construed with great strictness. There is no difference in effect between a condition *subsequent* and a *limitation* on the continuance of the gift. A breached condition, or failure, in consequence of one's own acts creates a like loss of property — a forfeiture.

Where conditions *precedent* are imposed, the beneficiaries take no vested interest, because the right to take is conditional and, until performed, no interest legal or equitable is taken. (*Matter of Mahlstedt*, 140 Misc. 245, 252.)

In the instant case the " acquittance " may not be asked for years to come. Upon what theory can the condition be said to be precedent? During the intervening years the beneficiary partakes of the income of the trust.

Conditions precedent involve the doctrine of election as found in *Caulfield* v. *Sullivan* (85 N. Y. 153, 158) and *Beetson* v. *Stoops* (186 id. 456, 463). Election is the choice between two alternative and inconsistent rights. The distinction is a matter of construction. A testator may provide that a person accepting his bounty shall abandon other rights, but such provision is *precedent*. In such cases there must be the election. The rule in *Matter of Brown* (212 App. Div. 677; affd., 240 N. Y. 646) cannot be applied to the facts in the instant case. The principle of election rules where a person is required to give up one thing to be able to receive another.

In my judgment, we are clearly dealing with a condition *subsequent*. Gifts that are given on condition subsequent, gifts that tend to inspire fear or dread, have been termed by courts as *in terrorem* gifts. What makes them *in terrorem* in character is the fact that the legacy becomes null and void if the legatee fails to observe the condition and there is a gift over to persons other than through the residuary clause. It is a method of bringing pressure to induce the surrender of something. It is termed the doctrine of *in terrorem*. Chief Judge ANDREWS in *Hogan* v. *Curtin* (88 N. Y.

162, 171) classified it as but " a convenient phrase adopted by judges to stand in place of a reason for refusing to give effect to a valid condition."

*In terrorem* clauses are aimed at beneficiaries upon several grounds. (*Smithsonian Institution* v. *Meech*, [1898] 169 U. S. 398; *Bradford* v. *Bradford*, [1869] 19 Ohio St. 546; *Donegan* v. *Wade*, [1881] 70 Ala. *501; *Thompson* v. *Gaut*, [1884] 14 Lea [Tenn.], 310; *Hoit* v. *Hoit*, [1886] 42 N. J. Eq. 388; 7 A. 856; *Adams* v. *Adams*, [1890] 45 Ch. Div. 426; affd., [1892] 1 Ch. Div. 369; *Estate of Hite*, [1909] 155 Cal. 436; 101 P. 443; *Rouse* v. *Branch*, [1912] 91 S. C. 111; 74 S. E. 133.) As a general proposition, conditions subsequent not to dispute the validity of a will, or certain provisions therein, will be upheld. (*Matter of Stewart*, [1889] 1 Connolly, 412; *Hogan* v. *Curtin*, *supra; Oliver* v. *Wells*, 134 Misc. 893; affd., 229 App. Div. 356; affd., 254 N. Y. 451; *Matter of Brush*, 154 Misc. 480, 482.) This is in accord with the principles obtaining in other jurisdictions. It is not denied that a testator has the right to attach to a bequest or devise made by him any condition " whether sensible or futile," provided only that it is not illegal, nor opposed to public policy. (*Oliver* v. *Wells*, 254 N. Y. 451, 459; *Matter of Salomon*, 156 Misc. 445, DELEHANTY, S.) The condition imposed in *Oliver* v. *Wells* (*supra*) did not offend the public policy of the State. It falls within the line of cases where the condition imposed is ordinarily valid. Such have been held to be good, when made in good faith and *not against public policy*. (*Matter of Cook*, 244 N. Y. 63, 69.)

Is article sixth violative of the public policy of the State of New York? Is the condition subsequent concurrent with the duration of the life of the will trust? Does the condition infringe upon public policy? What is public policy?

The petitioners and special guardians contend that the condition is against public policy. They mean that it is the policy of the State to protect persons in their right of property; that it is against such policy to permit a person to bargain away such right; that it is against such policy to substitute the ideas of a person in place of the law, or to permit the impairment of the power of the judicial process.

Public policies in general are those considerations of public interest and morality which the State enforces by legislation or judicial action. The earliest trace of this principle in the English law reports is found in a case decided in the reign of Henry V in 1414, when a dyer had contracted not to use his art within a certain town for a certain time, and the court went upon the principle that it was not good for the realm, that it was against public policy for men to bind themselves not to exercise their trades. The principle of public policy has never been repudiated and its application has varied with changing conditions and public opinion.

It is applied in avoiding contracts, for the stifling of criminal prosecutions, or the *perversion of justice* in *civil suits.* ("The Doctrine of Public Policy in the Law of Contracts," Elisha Greenhood; Policy of the Law, 49 C. J. 1073; 50 id. 857, § 62.)

The principle of public policy owes its existence to the very sources from which the common law is supplied. (Ballantine Law Dict. p. 1048; article on "Public Policy in the English Common Law," 42 Harvard Law Review [1928], p. 76.) Private rights are shaped by public policy. When we speak of the public policy of the State, we mean the law of the State, whether found in the Constitution, the statutes, or judicial records. (*People* v. *Hawkins,* 157 N. Y. 1, 12.) In a judicial sense, public policy does not mean simply sound policy, or good policy, but it means the policy of a State established for the public weal, either by law, by courts, or general consent. (*Hollis* v. *Drew Theological Seminary,* 95 N. Y. 166, 172; *Matter of Lampson,* 33 App. Div. 49, 51; *Vidal* v. *Girard's Executors,* [1884] 2 How. [U. S.] 127; *Clough* v. *Gardiner,* 111 Misc. 244, 248; affd., 194 App. Div. 923; *Matter of Killough,* 148 Misc. 73, 88.) Public policy is necessarily variable. It changes with changing conditions. It is evidenced by the expression of the will of the Legislature contained in statutory enactments. The power to determine what the policy of the law shall be rests with the Legislature within constitutional limitations, and when it has expressed its will and established a new policy, courts are required to give effect to such policy. A result which is against public policy is not to be condoned because it was done with an innocent intent. (19 Cornell Law Review, Dec. 1933, p. 157.)

What is against public policy is to be determined in particular instances upon facts which may be found to be against substantial public interest.

The power of the State to regulate the tenure of real property within its limits, the modes of its acquisition and transfer, the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. Every person must will his lands and property in accordance with and subject to the conditions and limitations provided by statute, or else he cannot will them at all. His power is bounded by the conditions prescribed. (*United States* v. *Fox,* [1876] 94 U. S. 315.) The rights of dower and curtesy may be wiped out altogether or modified, as has been done by the recent Decedent Estate Law (Laws of 1929, chap. 229). Trusts may not be created, except for two lives in being. The suspension of the power of alienation of an estate for a longer period is void and of no effect. (Real Prop. Law, § 42.) Testamentary gifts to charitable and religious associations of more

than one-half of the testator's estate in certain circumstances are prohibited. (*Decker* v. *Vreeland*, 220 N. Y. 326; *Fisher* v. *Fisher*, 253 id. 260, 263.) An assignment by an executor of his prospective commission is wholly void on grounds of public policy. (*Matter of Worthington*, 141 N. Y. 9, 12.)

The privilege to acquire property and to will it, as well as to inherit it, is granted by the laws of the State. The right to make a will is not a natural or inherited right, but a privilege which the State can grant or withhold at its discretion. If granted, it may impose such limitations upon the privilege as the Legislature sees fit to prescribe. (*Matter of Dows*, 167 N. Y. 227, 231; *Matter of Frazier*, 188 N. Y. Supp. 189, FOWLER, S.) The heir or devisee under probate law, or the common law, is protected in his right to property by the State and Federal Constitutions. The statutes of the State of New York enacted to protect persons in the right and administration of property are found in the Decedent Estate Law, the Surrogate's Court Act, the Real Property Law, the Personal Property Law, and in other laws of the State. These laws were enacted from the viewpoint of the public interest or common weal. They take on a State interest and fall within the doctrine of public policy. The basic principle of this doctrine is the good of the whole people — the State. The State has enacted general laws for the control of property of incompetents and deceased persons through its control of administrators, executors, trustees, guardians and committees.

The following are a few examples of public policy:

Contracts which purport to totally exempt from liability for negligence are against public policy. (*Straus & Co.* v. *Canadian Pacific Ry. Co.*, 254 N. Y. 407, 413.)

A condition tending to restrain freedom of religion is invalid as against public policy. (*Drace* v. *Klinedinst*, 275 Penn. St. 266; 118 Atl. 907.)

*Matter of Hutchins* (147 Misc. 462) held that a condition tending to disrupt a marital status was contrary to public policy and void. (See *Matter of Seaman*, 218 N. Y. 77.) What the law condemns is an unreasonable restraint on marriage or a condition annexed to a gift which encourages or induces a separation. Such condition and restraint are void because they violate sound public policy.

The policy of the State has been to refuse to recognize as binding a decree of divorce obtained in a court of a sister State not the matrimonial domicile. (*Hubbard* v. *Hubbard*, 228 N. Y. 81, 84.)

A settlor, regardless of residence, cannot establish a trust to be administered here which offends our public policy. (*Hutchinson* v. *Ross*, 262 N. Y. 381, 394.)

Agreements limiting jurisdiction of courts, as by an agreement not to sue in a particular court, are void as against public policy (*Doyle* v. *Continental Ins. Co.*, 94 U. S. 535; 3 Williston Cont. § 1725); or an agreement to deprive parties of their rights. (32 Columbia Law Review, [1932] p. 377.)

A contract which binds one of the parties to do that which is contrary to the policy of the State or Nation is void, no matter how solemnly it may have been made. (*Matter of Hughes*, 225 App. Div. 29; affd., 251 N. Y. 529.)

The Workmen's Compensation Law was enacted for the public welfare of the State. (*Matter of Jensen* v. *Southern Pacific Co.*, 215 N. Y. 514.)

The Arbitration Law is a new public policy of the State of New York. Public policy has decreed the rent laws, emergency laws, and such laws as the Banking, Education, Judiciary, Insurance, Labor, Public Health, Workmen's Compensation Law, and others.

In the public interest, the State has ever deemed it essential that certain obligations should attach to a marriage contract, amongst which is the duty of a husband to support his wife. (*Tirrell* v. *Tirrell*, 232 N. Y. 224, 229.)

The fundamental public policy is perceived to be that rights lawfully vested shall be everywhere maintained. (*Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 113.)

There are other restraints phrased in either the disabling or the forfeiture form. There is a rule of public policy against the validity of a gift which interferes with descent in event of a failure to alienate. (44 Yale Law Journal, May, 1935, p. 1186.)

These laws are samples of Anglo-Saxon concepts of governmental protection to society and mankind, and a testator is not permitted at his pleasure to violate law laid down as an evidence of public policy. The individual must be subordinated to the community.

By the passage of property laws the State indicates a legislative intent that, as a matter of public policy, the person interested in property has the constitutional right to protect his property. As a matter of public policy the courts of the State are granted power and given jurisdiction for the purpose of protecting and safeguarding the vested rights of property. Public policy requires the enforcement of the laws of the State affecting property rights.

The condition in article sixth of the instant will would prohibit a person vested with property rights from asserting those rights and would restrain his right in the enforcement of law which would tend to protect his right of property.

History has fostered and shaped the powers and functions, as well as the control, of executors and trustees. Section 40 of the

Surrogate's Court Act is a grant of general jurisdiction to surrogates with the right to administer justice in all matters relating to the affairs of decedents and to determine all questions, legal or equitable, and to make a full, equitable and complete disposition of the matter in controversy, to direct, control, conduct and settle accounts of executors, administrators and testamentary trustees. When the jurisdiction of an important court is at issue, the duty of the court is plain. The public interest would be endangered by the non-enforcement of the rights of property accorded under the Constitution and the statute laws of the State.

The courts will be guided by public policy or interest in general — a definite policy of the government in the administration of justice. " When that rule [public policy] has been ascertained, it becomes their [the courts'] duty to refuse to give effect to a private contract which violates the rule and would, if judicially enforced, prove injurious to the community." (Lord WATSON in *Nordenfeldt* v. *Maxim, etc.,* 1894 App. Cas. 535, 554.) And, in " The Nature of the Judicial Process," Judge CARDOZO adds: " A like thought finds expression in the opinions of our own courts " (p. 96).

The late Mr. Justice OLIVER WENDELL HOLMES of the United States Supreme Court wrote in " The Common Law " ([1881], pp. 35 and 36): " On the other hand, in substance the growth of the law is legislative. And this in a deeper sense than that what the courts declare to have always been the law is in fact new. It is legislative in its grounds. The very considerations which judges most rarely mention, and always with an apology, are the secret root from which the law draws all the juices of life. I mean, of course, considerations of what is expedient for the community concerned. Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to views of public policy in the last analysis."

The executors contend that the provisions in article sixth relate only to acts of the trustees during the testator's life and, upon his death, the condition ceased to continue to be operative. The intent of the testator must be found in his written words. Although " couched in the language of their composer " rather than that of the testator, the testator is charged in law with their acceptance.

The document was prepared by an experienced draftsman, an attorney of ability and erudition. The same draftsman prepared the two trust agreements. None of the words or sentences of article sixth of the will are ambiguous and so must be given their ordinary

grammatical meaning. (*Overheiser* v. *Lackey*, 207 N. Y. 229, 233.) The provisions are not obscure, and the intention of a will maker is to be found in the words used. (*Matter of Watson*, 262 N. Y. 284, 299.)

The condition in article sixth refers to the *administration* of the assets, capital and income, *created by the two inter vivos trusts*. In the first part of the article the testator uses the precatory word " desire," and says that all " *which has been done* " and all the acts " *which have been taken* " by the trustees thereunder, and their successors, it is his " desire " shall be acquiesced in, ratified and confirmed by the beneficiaries. Up to this part of the article, it may be said that the testator spoke in a precatory manner of those acts which, as he stated, " I have been kept informed of " as being such administrative acts taken by the trustees prior to the death of the testator. If article sixth had ended at the semicolon, it could be held to have been entirely precatory and without force. (1 Jessup & Redfield, 899; *Phillips* v. *Phillips*, 112 N. Y. 197; *Collister* v. *Fassitt*, 163 id. 281; *Post* v. *Moore*, 181 id. 15; *Matter of Copeland*, 38 Misc. 402; *Matter of Buckley*, 135 id. 156; *Matter of Hoyt*, 142 id. 344; *Matter of Coughlin*, 149 id. 672, 674; *Matter of Davidge*, 200 App. Div. 437.) However, at this point the draftsman inserts a semicolon and continues and says: " and I do declare and *direct* (and all the dispositions of my property by this Will I make subject to this condition) that *all devises, bequests, benefits and gifts provided for herein are and shall* (*in addition* to such other limitations and conditions as are herein contained) be, and I hereby give, devise and bequeath the same, upon the *further specific condition* that each and every of the beneficiaries herein named to receive any part of my estate, directly or indirectly, immediately or *at any time after my death*, shall, by a writing in form satisfactory to my Executors and/or Trustees, duly executed and acknowledged and filed with my Executors and/or Trustees (and within a time to be specified by my said Executors and/or Trustees) respectively acquiesce in the *administration* of said trusts and each of them, and approve, ratify and confirm *all acts and things done* by the respective Trustees thereunder and *their successors* and each and every of them with respect to the *administration* of the trust properties under both or either of said trust agreements and the income therefrom." (Italics mine.)

The word " further " as used by the testator means additional; as for instance, " further " compensation means *additional* compensation. " Further " means future. (4 Words & Phrases [1st Series], p. 3016.) " Further " means wider or fuller; additional; as *further* remarks. It means something additional, something new. (New Standard Dict. [1928].)

The " semicolon " is a mark of grammatical punctuation used in English to indicate a separation in the relations of the thought a degree greater than that expressed by the comma. The main reason for using the semicolon is that the break is too decided for the comma. (F. Horace Teall, " Punctuation," p. 17.)

As an evidence of the testator's intent with regard to the *in terrorem* clause and its *concurrent operation* during the full term of the trust, I refer to the latter part of the fourth paragraph of the will in which the testator says: " I hereby direct, and it is my intention, that this same method [referring to the distribution] shall apply to and be used in making the *disposition of the share, both of income and principal,* of any beneficiary who shall fail or refuse to comply with the conditions contained in the Section of this Will designated ' sixth.' " Here Mr. Andrus looked into the future.

It will be recalled that the will was executed in 1924 and the several codicils were executed May 17, 1926, May 26, 1927, and March 24, 1930, and that the only change that the codicils made was in the naming of executors and trustees. Therefore, it is difficult to say up to what date Mr. Andrus intended to ask his beneficiaries for approval. At the time of the will making he referred to a state of things actually existing. It might be said that Mr. Andrus intended to have ratified and confirmed only those acts which had " been done " up to the date of the making of the will, and not those acts up to the date of the making of the last codicil which republished the will. " Whenever the testator refers to an actually existing state of things his language should be understood as referring to the date of the will and not to his death." (*Rogers* v. *Rogers,* 153 N. Y. 343, 347.) It is not of great materiality in deciding the issues whether he had in mind to ask for approval of acts up to the date of the will making, or up to the date of his death.

Article sixth is so comprehensive in its scope as to cover the entire period of administration of the trusts, and is broad enough to absolve the trustees during the entire terms of the trusts from all responsibility for their actions, regardless of the legality of their administration of the trusts.

I hold that the condition not only relates to and affects administrative acts in relation to the *inter vivos* trusts up to the time of his death, but to administrative acts for the full duration of the trust term created by the will. In my opinion, this is what the lawyer who drew the will has caused Mr. Andrus to say is his intention. The court has stated the legal effect of his language.

Article second of the trust deeds gives immunity to the acts of trustees, save for bad faith and gross negligence, and, if the power

clauses of the trust deeds are carried into the will by reference, as this court hereinafter decides has been done, the beneficiaries under the will may not inquire into any acts of trustees of the trust agreements to determine whether there has been bad faith, or gross negligence, or for any other cause.

Let us see what powers the two trust agreements contained that Mr. Andrus wanted carried over into the will by reference.

The settlor in the two trust agreements gave the trustees full power to operate, manage and control the trust estate " as *fully and freely* as the Grantor could *deal therewith, if it were his individual property, without any regard to any restrictions to which trustees are ordinarily subject* * * * and if the question should ever arise as to whether the Trustees had or had not the right or power to do any act or thing in relation to the trust estate, it is the intention of the parties hereto that said question shall always be resolved in favor of the Trustees possessing the power they desire to exercise." In the management of the trust estate, the majority opinion of the trustees, with the corporate trustee as one of the majority, shall always prevail. There shall always be three trustees — one corporate and two individuals. In case of the resignation, death or other disqualification, provision is made for substitution. No trustee shall be liable for the acts of any other trustee, nor for the depreciation in value of any property forming part of the trust " *and no Trustee shall in any event be liable hereunder for any action taken in good faith, and shall only be liable for his or its own gross negligence.*" (Italics mine.)

It is the intention of the parties hereto that the powers conferred upon the trustees " shall be and be deemed to be as broad and unlimited as the powers which the Grantor possesses and may exercise." The settlor provides for other powers with regard to the sale, lease and management of the trust property and further says that they " may allocate the cost thereof [referring to repairs, demolition and rebuilding] as between principal and income in accordance with their own judgment." They are given the power to operate and deal with mines, watercourses, farm and timber lands, and with the expenditure of money thereon, in their absolute discretion, and may allocate the costs between principal and income in accordance with their own judgment. Their powers are extended to borrow money for any purpose which, in their uncontrolled discretion, they shall deem for the best interests of the trust, with the right to transfer to a corporation in exchange for securities; they may take stock or securities in a corporation undergoing reorganization; any division made of the trust estate on the termination of any of the trusts or otherwise, may be in kind or otherwise; and

" all securities and shares of stock belonging to the Trust Estate shall be kept in the custody of and under the control of the Corporate Trustee."

Thus article second of the trust agreements gives immunity to the trustees, except for acts of bad faith and gross negligence. Such a provision is not found in the will. The result is sought in another manner. That is as far as the settlor could go because of the limitations placed by law in the enforcement of immunity provisions. (Bogert on Trusts and Trustees, [1935], vol. 3, p. 1715, § 542, and further sections entitled " Limitations on Immunity Clauses," and cases cited, vol. 3, p. 1785, § 558, and p. 1793, § 560.) In *Carrier* v. *Carrier* (226 N. Y. 114, 125) the court said: " It is true that the creator of this trust had reserved to himself the broadest rights of management. His discretion was to be ' absolute and uncontrolled.' That does not mean, however, that it might be recklessly or willfully abused. * * * His discretion, however broad, did not relieve him from obedience to the great principles of equity which are the life of every trust. (*Globe Woolen Co.* v. *Utica G. & El. Co.,* 224 N. Y. 483; *Munson* v. *Syracuse, G. & C. R. R. Co.,* 103 N. Y. 58.) " (*Browning* v. *Fidelity Trust Co.,* 250 Fed. 321; *Jothann* v. *Irving Trust Co.,* 151 Misc. 107.) This principle is recognized by The American Law Institute " Restatement of Trusts," Proposed Final Draft, March 1, 1935, section 214, subdivisions (2) and (3).

However, the will attempts to effect the purpose which equity holds the settlor's trust agreements could not accomplish, *i. e.,* immunize acts of bad faith or gross negligence. The testator in his will speaks of effecting harmony in the administration of the trusts and the estate, demonstrating an intent that the trust deeds and will were to be treated as interlocking in character. By this very unusual method, the illegal slack in the trust agreements is attempted to be taken up through the forfeiture process in the will. But the same equitable doctrine that denied the settlor the right to give full immunity to the trustees of the trust agreements confronts and thwarts at this juncture. It is the man and the State — one runs counter to the other.

A trustee may be liable for making unlawful or improper investments; obtaining advantage out of investments; failure to invest; making improper contracts, dissipating assets; defaulting on contracts made for the benefit of the trust estate; paying improper claims; negligence in the exercise of powers; bad faith, embezzlement. Article sixth of the will compels the ratification of any of such acts for the duration of the will trust and prevents remedies to protect the rights of property of the beneficiaries. This rule the testator attempts to overcome. The general rule of law is that

a trustee, in acquiring consent, or ratification, must make disclosures of all the facts which would exist at the time. (*Adair* v. *Brimmer*, [1878] 74 N. Y. 539; *Meinhard* v. *Salmon*, [1928] 249 id. 458; *Matter of Peck*, [1934] 152 Misc. 315; 4 Bogert on Trusts and Trustees, [1935] p. 2780, § 961.) This sound equitable principle would be nullified.

In this State the tendency has been to hold void conditions subsequent if they countervene established principles of law, or are harsh, unreasonable or impolitic. Where the condition is indefinite, it is held ineffective. (*Matter of Jackson*, [1892] 20 N. Y. Supp. 380.) Where there is *causa probablis litigandi* for a contest or construction of the will, the condition is without force. (*Jackson* v. *Westerfield*, [1881] 61 How. Pr. 399; *Woodward* v. *James*, [1887] 44 Hun, 95; affd., 115 N. Y. 346.) Where the condition is repugnant to the devise or bequest, it is void. (*Dorland* v. *Dorland*, [1847] 2 Barb. 63; *Staples* v. *Hawes*, 24 Misc. 475; affd., 39 App. Div. 548.) Where there is no gift over of personalty in the event of breach, the condition is void despite the residuary clause. (*Matter of Anonymous*, [1913] 80 Misc. 10; *Matter of Arrowsmith*, [1914] 162 App. Div. 623; affd., 213 N. Y. 704; *Matter of Farmer*, [1917] 99 Misc. 437; *Matter of Hamilton*, [1917] 100 id. 72; *Matter of Kozlay*, [1918] 104 id. 120; *Matter of Fox*, [1921] 114 id. 368; *Matter of Marshall*, [1922] 119 id. 407; *Brown* v. *O'Barn*, [1923] 120 id. 550; *Matter of Bailey*, [1931] 141 id. 748; *Matter of McArdle*, [1933] 147 id. 876; *Matter of Donald*, [1933] 149 id. 142.)

Where there is a condition in restraint of a legal marriage or to interfere with an existing marriage, it is void. (*Matter of Haight*, [1900] 51 App. Div. 310; *O'Brien* v. *Barkley*, [1894] 28 N. Y. Supp. 1049; *Cruger* v. *Phelps*, [1897] 21 Misc. 252; *Hogan* v. *Curtin*, *supra; Matter of Scott*, [1924] 204 N. Y. Supp. 478.)

Where there is a condition providing for forfeiture if a claim is presented, it will be disregarded if the claim is legitimate and the legacies not given in lieu of payment thereof. (*Matter of Vandevort*, [1892] 62 Hun, 612; *Matter of Marshall*, [1922] 119 Misc. 407; *Matter of Cronin* [1932] 143 id. 559.)

Exceptions to the general rule find acceptance in other States and in England. (*Powell* v. *Morgan*, [1688] 2 Vern. Ch. 90; *Lloyd* v. *Spillet*, [1734] 3 P. Wms. 345; *Morris* v. *Burroughs*, [1737] 1 Atk. 399, 404; *Lee* v. *Colston*, [1827] 21 Ky. 238 [5 T. B. Munroe]; *Warbrick* v. *Varley, No. 2*, [1861] 30 Beav. 347; *Rhodes* v. *Muswell Hill Land Co.*, [1861] 29 id. 560; *Chew's Appeal*, [1863] 45 Penn. St. 228; *Adams* v. *Adams*, [1890], *supra; Matter of Williams*, [1912] 1 Ch. Div. 399; *Black* v. *Herring*, 79 Md. 146; 28 Atl. 1063.)

Generally, where decisions seem to the contrary, the conditions were in the nature of being precedent. Where the condition is contrary to established principles of common law or to the statute, it has been held void. Where the condition subjects the legatee to a forfeiture for doing that which is his duty, it has been declared void.

The cases in our State that reflect upon the question are few. In *Bryant* v. *Thompson* ([1891] 59 Hun, 545; appeal dismissed, 128 N. Y. 426) the court said: " Any reasonable condition may be contained in a will, but where the condition is such as to subvert the course of judicial proceedings and to deprive the court of the right and duty imposed upon it by law to institute, of its own motion, proper proceedings for the protection of the infant's rights, the question immediately becomes one of public policy and brings into the discussion entirely new considerations. So far as I can ascertain, there has been no decision in the courts of this State directly upon the point. * * * Any provision in a will which, in its application, comes in conflict with the organic or statutory law of the State, by which it is made the duty of the courts to look after the rights of infants, irrespective of the fact whether they are of tender years or not, must be deemed to be illegal and void as being against public policy." This may be dictum, but it indicates the views of the court. This opinion was criticized in *Moorman* v. *Louisville Trust Co.* ([1918] 181 Ky. 30; 203 S. W. 856), but at pages 41 and 42 the court had the following to say: " We would not care to dispute the proposition that such a clause was invalid as against public policy if it did, in truth, tend even in the slightest degree to deprive the courts of the powers and duties imposed upon them by law for the protection of infants. or if it could stay or trammel the courts in the exercise of their judicial functions."

In *Matter of Kathan* ([1913] 141 N. Y. Supp. 705) Surrogate FOWLER wrote an illuminating opinion regarding the common and testamentary law concerning the validity or invalidity of conditions. The learned surrogate said (at p. 708): " But not all conditions may be prescribed by testator, but only those which are lawful in themselves. Testators are not by the common testamentary law justified in prescribing unlawful or impolitic conditions or conditions contrary to the order of the state. 4 Burn. Ecc. Law, 213; Swinburne Wills, 431, 462. * * * One of the best expositions of the common law of conditions will be found in the *Bridgewater* Case, entitled *Egerton* v. *Earl Brownlow*, 4 [Clark's] H. L. Cas. 1, 210, rejecting the very restricted view of the lower courts and affirming the invalidity of conditions contrary to public order. * * * A condition, for example, that a testamentary donee shall not pro-

tect by action any right arising under the will, is contrary to public policy. It is too general."

In *Matter of Carples* (140 Misc. 459) the condition subsequent was held void, because the conditions were " so coupled with harsh and cruel penalties that they are undeniably against public policy and void," quoting *Matter of Haight* (51 App. Div. 310, 313); *Whiton* v. *Snyder* (54 Hun, 552, 555); *Wright* v. *Mayer* (47 App. Div. 604); *Cruger* v. *Phelps* (21 Misc. 252); *O'Brien* v. *Barkley* (28 N. Y. Supp. 1049); *Matter of Hutchins* (147 Misc. 462, 464); *Matter of Forte* (149 id. 327, 330). These cases dealing with the concepts of public welfare tell me where to go.

In the English case of *Rhodes* v. *Muswell Hill Land Co.* (29 Beav. 560) the will " further declared " and provided for a forfeiture in the event that the devisees commenced or instituted proceedings at law or in equity in relation to the property devised to them. It was held that the " matter of things " referred to were the " estate and effects " and that the condition of forfeiture was void as it would prevent the devisee taking any legal proceeding necessary for the protection of his rights. The master of the rolls, Sir JOHN ROMILLY, in respect to this provision, said in part: " The testator says, I give you the property, but if you resort to any proceedings whatever respecting it, even to secure its enjoyment, I give it to someone else; the thing is absurd. * * * The consequence is, that this provision is absurd, inconsistent and repugnant, and I have no hesitation in saying, that it constitutes no objection to the title."

The several trusts will probably last for many years, because they are all laid upon the lives of young people. Present beneficiaries will die. Present individual trustees will die. Other trustees may take their places. Negligence or dishonest acts may be committed in the handling of the trust fund. If such a condition subsequent should be sustained, courts of equity would be ousted of their jurisdiction to hold trustees accountable, and to control their acts. We need not look to negligent, or dishonest acts. Even between honest trustees and beneficiaries, there is often a divergence of opinion with respect to the administration and management of an estate. The cloak of an *in terrorem* provision cannot shield honest trustees any more than it can cover up and protect an unscrupulous trustee. The test is not between honest and dishonest, or negligent and non-negligent trustees. The test is between the desires of men and the Constitution and the laws of the State. Which is supreme — the outstretched dead hand of a testator, or the public policy of a State or Nation?

The maker of a trust cannot be permitted to thwart the provisions of the Constitution and the statute law of the State, and the

powers and jurisdiction of a court which controls the administration of a trust, by inserting in his will a condition subsequent of the type and character of the one in the instant case. If so, the trustees would be permitted to violate the law and the public policy of the State with impunity and deprive the beneficiaries of their property without due process of law as guaranteed by the State and Federal Constitutions.

Those who create trusts must not circumvent the law governing and controlling trustees and nullifying safeguards which the law has established for the protection of beneficiaries of trusts. The public policy of this State is that the administration of trusts shall be under the supervision of the courts. (1 Pom. Eq. Jur. § 151; 2 Story Eq. Jur. [14th ed.] § 1300; 21 C. J. § 93; 1 Bogert Trusts and Trustees, § 161; 2 Perry Trusts and Trustees, § 511-a.)

In sustaining forfeiture clauses in certain cases, the State has had no particular interest as to whether one claimant or another takes under a will. (*Smithsonian Institution* v. *Meech,* 169 U. S. 398.) None of the reasons underlying that decision are present here. If the State has no particular interest in whether one claimant or another takes under a will, it is readily understandable why the courts have held it *good* policy to sustain forfeiture clauses which provide for forfeiture in the event of a contest of a will.

None of the reasons which tend to make it a *good* policy to prevent a contest of a will apply to the provision in Mr. Andrus' will which has for its purpose the removing of the administration of the trusts created by him from the jurisdiction of courts of equity. His attempted provision runs counter to the very fundamental principles of trust law as enforced by courts of equity. The State has a real interest in having its courts of equity supervise trust administration and, therefore, it is *bad* policy to permit a testator by the device of an *in terrorem* clause to circumvent the State's declared policy. (*Matter of vom Saal,* [1913] 82 Misc. 531.) And the right of a party to legal redress if he is legally injured is jealously guarded by the courts. (3 Williston Cont. § 1725; Jarman Wills [6th ed. Eng.], p. 1550; *Rhodes* v. *Muswell Hill Land Co.,* [1861] 29 Beav. 560; *Billings* v. *Marshall Furnace Co.,* 210 Mich. 1; 177 N. W. 222.)

There is ample authority in the books for holding that whatever may be attempted to be done to violate the public policy of the State is void. The questions before the courts arise in determining whether or not a clause is contrary to public policy. Where testator's intent is apparent, all rules to the contrary must yield, " provided that intent does not offend against public policy, or some positive rule of law." (*Robinson* v. *Martin,* 200 N. Y. 159, 164.) A device to render trustees free to administer trusts without

respect to the law of this State cannot receive judicial sanction. (*Matter of Hughes*, 225 App. Div. 29; *Matter of Hutchins*, 147 Misc. 462.) The right to acquire, and the personal exercise of power and dominion over property while the blood of life courses through the veins must end when men pass into the unknown. At such time property passes into new ownerships and control, and denial to such new owners of the right to litigate questions concerning it, the giver cannot bring about. The law — the law of public policy — the Constitution — sees to that.

And too, the condition subsequent herein is violative of constitutional rights of beneficiaries. The testator attempted to bargain away the property rights of beneficiaries under compulsion. Constitutional rights of property parallel the development of constitutional limitations on governmental bargaining power. The cases in the field of law wherein the State trades a right granted for one to be given up have been decided in the light of the doctrine of public policy. These decisions more fully reflect upon the instant case than any other court determination. Neither the State, nor an individual, may compel the surrender of a constitutional right as a condition of a favor.

The provisions of article 1, section 6, of the Constitution of this State, as well as the Fourteenth Amendment to the Constitution of the United States, provide for the protection of the life, liberty and property of persons.

In *Home Insurance Co.* v. *Morse* ([1874] 87 U. S. 445) the court wrote: " Every citizen is entitled to resort to all the courts of the country, and to invoke the protection which all the laws or all those courts may afford him. A man may not barter away his life or his freedom, or his substantial rights * * *. In *Scott* v. *Avery*, * * * (5 [Clark's] House of Lords Cases, 811) the Lord Chancellor says: ' There is no doubt of the general principle that parties cannot by contract oust the ordinary courts of their jurisdiction.' "

A condition requiring the abstention of a constitutional right is always unconstitutional. It is against the public policy to condition a gift by compelling the beneficiary to forego a legal right. He is deprived of the right of free choice as to future conduct. It is the right to impose the condition, not the motive, which is the test to be resorted to for the purpose of determining whether it offends public policy. For a testator to exercise such authority would permit him to deprive of fundamental rights those entitled to the protection of the Constitution. It was held in *Frost Trucking Co.* v. *R. R. Com.* ([1926] 271 U. S. 583) that a State may not impose conditions which require the relinquishment of constitutional rights. Such a right would strip the citizen of rights guaranteed by the

Constitution. The court said (at p. 594) through Mr. Justice SUTHERLAND: "It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence."

All appearing counsel agree that the beneficiaries have vested property rights in their shares of the estate. The courts, in the exercise of their judicial function, are without power to deprive a person of his property or his right of property unless by due process of law. (*People* v. *Henriques & Co., Inc.*, 267 N. Y. 398, 402, 408.) Individuals can have no greater right or prerogative than the courts.

It becomes the duty of courts to voice for the whole people the expression of their will. Informed reason and public conscience are the guide for the application of the doctrine of public policy. Established constitutional principles must be sustained. No effacement or impairment of the property rights of men will be countenanced.

The plainly written intention declared in the will, especially in article sixth, is utterly inconsistent with the Constitution and the law of the State.

I hold that the testator's attempted control of the *disposition, administration and investment* of property of the trust agreements through the process of the so-called *in terrorem* clause in the will is unlawful and article sixth is invalid.

The research of the law evidenced by the briefs of counsel and the special guardians upon this novel and important question has been of material aid to the court.

This is the first known instance where such oppressive restraint is laid upon a gift. The destruction of the forfeiture scheme must take place at its first appearance in a court of equity if any rights of property are to be preserved and the Constitution kept inviolate. Nothing less is aimed at in this decision.

The third contention of the petitioners is that the sixth paragraph of the will is void as to Vincent Dyckman Andrus because of his infancy.

Having heretofore held that the condition subsequent was unconstitutional and void as against the public policy of the State, that part of article sixth having reference to infants falls with the rest of the structure. In support of the petitioners' contention upon this point may be cited *Woodward* v. *James* (44 Hun, 95, 100; affd., 115 N. Y. 346, 360); *Bryant* v. *Thompson* (59 Hun, 545; appeal dismissed, 128 N. Y. 426; 7 Heaton Surrogates' Courts ([5th ed.] § 494); 2 Jessup-Redfield (§ 931); Twyeffort New York Estates (§ 696); *Matter of Kathan* (*supra*); *Matter of Forte* (149 Misc. 327); *Matter of Andrews* (151 id. 361); *Lee* v. *Colston* ([1827] 21 Ky. [5 T. B.

Munroe] 238, 246); *Moorman* v. *Louisville Trust Co.* ([1918] 181 Ky. 30, 41; 203 S. W. 856). With regard to this point I further hold that, so far as article sixth conflicts with the statutory law of the State by which it is made the duty of the courts to look after the rights of infants, the provision is illegal and void as being against public policy.

The fourth objection relates to unlawful accumulations of income as violative of the public policy of the State as declared in Real Property Law, section 61, and Personal Property Law, section 16. As the condition subsequent has been declared to be void, no gainful purpose is had in a discussion of this phase of it. I will only cite the further cases. (*Matter of Rogers*, 22 App. Div. 428; *Bankers Trust Co.* v. *Moy*, 148 Misc. 38; *Matter of Schaefer*, 110 id. 628; *Matter of Rosenstein*, 152 id. 777; *Unger* v. *Loewy*, 202 App. Div. 213, 218; *Matter of Vandevort*, 62 Hun, 612.)

The fifth contention relates to the question of incorporation by reference of the power provisions found in the two trust agreements.

The fifth paragraph of the will grants the trustees certain definite powers, including the right to manage, operate and control the principal of the trust property " as fully and freely as I could have managed and disposed of the same if living, without regard to any restrictions to which trustees are ordinarily subject, statutory or otherwise." *The testator confers upon the trustees of the will* " all the powers in connection with the *disposition, administration and investment* of the capital of the trust hereby created which I conferred upon the Trustees under two certain trust agreements * * * it being my intention and desire that the trustees under said trusts and the trustees under this my Will, shall, so far as legally possible, have the power to cooperate and act coextensively and in harmony in the administration and disposition of the property which I disposed of by said trust agreements and the property of which I dispose in trust by the terms of this Will." (Italics mine.) The testator further says that if any question should ever arise as to whether the trustees had the right or power to do any act or thing in relation to the trust property, " it is my intention that said question shall always be resolved in favor of the trustees possessing the power they desire to exercise."

The other terms of the will are in conformity with the general terms of the two trust agreements. They are quite in harmony except that the trust agreements lack the so-called *in terrorem* clause found in the sixth paragraph of the will.

The decisions of the New York courts in refusing to accept the doctrine of incorporation by reference (*Booth* v. *Baptist Church*, 126 N. Y. 215, 247), followed in other States, particularly in New

Jersey and Connecticut, have been subjected to a modification in the doctrine by the more recent cases of *Matter of Fowles*, 222 N. Y. 222 and *Matter of Rausch* (258 N. Y. 327, followed in *Matter of Barlow*, 144 Misc. 210; *Matter of Hilliard*, 154 id. 872).

The rule against incorporation, well established though it may be, will not be carried to " 'a drily logical extreme.' " (*Matter of Fowles, supra*, at p. 233.) It is a rule designed as a safeguard against fraud and mistake. There are exceptions to its seeming generality. " One may ratify assumptions of power, extinguish debts, wipe out wrongs, confirm rights, by the directions of one's will." (*Matter of Fowles, supra*, at p. 233.) " But the execution of a power does not violate the rule against incorporation."

In the more recent case of *Matter of Rausch* ([1932] *supra*) the court definitely relaxed the rule of law affecting this question. The public policy, long recognized, of *post mortem* control of property was changed. A testator gave to a trust company *one-fifth of his residuary estate* to be held in trust for his daughter " *under the same terms and conditions embodied in the Trust Agreement made between myself and the said New York Trust Company*, dated April 15, 1922, the principal to be disposed of as contained in the said agreement, and which agreement is hereby made part of this my will, as if fully set forth herein." (Italics mine.) The court held it valid.

Chief Judge Cardozo, writing for the court, said (at p. 331): " A gift to a trust company as trustee of a trust created by a particular deed identifies the trust in describing the trustee." In the *Rausch* case the will gave *additional property* to the same trustees to be held in the same way as set forth in the trust deed.

In the instant case we have the reverse order and *additional powers* — the power clauses in the trust deeds — instead of property, are being carried from the trust agreements into the will.

Mr. Andrus adopted the power clauses in the trust agreements which he had executed instead of setting them out at length in the will. " The mind rebels against the formalism that would invalidate a bequest for no better reason than the omission to state the purpose of the trust again." (*Matter of Rausch, supra*, at p. 331.) Under the ruling of the *Rausch* case there is here no distinction between reciting definite powers in the will and a direction to *read* into the will definite powers set out in the properly executed trust agreements.

I understand from the opinion in the *Rausch* case that the reason for the modification of the rule against incorporation by reference is based largely upon common sense; that it is immaterial whether the matter carried into the will by reference relates to property, or things, or powers. It is the character of the identifying instru-

ment referred to and the circumstances surrounding its execution that is of importance. It is true here, as it was when Chief Judge CARDOZO wrote in the *Rausch* case (at p. 332): " Here the extrinsic fact, identifying and explaining the gift already made, is as impersonal and enduring as the inscription on a monument. * * * To insist upon a will so self-contained and self-sufficient as to make resort to things extrinsic needless in every possible contingency is to lose sight of the significance of language, its function and capacities." Judge CARDOZO said, in *Marks* v. *Cowdin* ([1919] 226 N. Y. 138, at p. 144): " We exclude the writing that refers us to spoken words of promise. We admit the one that bids us ascertain a place or a relation by comparison of the description with some ' manifest, external, and continuing fact.' " (Citing *Doherty* v. *Hill*, 144 Mass. 465, 469; 11 N. E. 581.)

I hold that the testator made a valid incorporation by reference to the powers contained in the trust deeds, in so far as they relate to the *disposition, administration and investment* of the capital of the trust created by the will.

Submit decree, upon notice to all attorneys appearing, and to the special guardians.