IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

LARRY D. BENTLEY                  )
and MARILYN S. BENTLEY,     )
                          )
        Plaintiffs,          )   TC-MD 170094R
                          )
        v.                )
                          )
DEPARTMENT OF REVENUE,     )
State of Oregon,              )
                          )
        Defendant.     )   **FINAL DECISION**[1]

Plaintiffs appealed Defendant's Notice of Assessment dated January 20, 2017, for the

2011 tax year. A trial was held in the Oregon Tax Court on July 25, 2017. Larry D. Bentley

appeared on behalf of Plaintiffs. Larry D. Bentley (Larry)[2] and Marilyn S. Bentley (Marilyn)

testified on their own behalf. Mindy McPherson appeared on behalf of Defendant but did not

testify. Plaintiffs' Exhibits 1 to 79 were admitted into evidence without objection. Defendant's

Exhibits A and B were admitted into evidence without objection.

## I. STATEMENT OF FACTS

Plaintiffs moved to Oregon in 1995 and soon thereafter purchased a home in Beaverton.

Larry testified that in 1998, his job opportunities in Oregon diminished and became more

sporadic and interspersed with long periods of unemployment. (*See* Ptfs' Ex 2 at 1.) By 2000,

with a lack of viable job opportunities in Oregon, Larry took a job in San Jose, California, where

he worked for approximately eight months. (*Id.* at 3.) In 2002, Plaintiffs purchased a Schooley

---

[1] This Final Decision incorporates without change the court's Decision, entered February 1, 2018. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and references to two individuals with the same last name, Bentley. To avoid confusion, the court will use the first name of the individual being referenced.

Mitchell telecom franchise (later called "Abilita") in Beaverton. (Ptfs' Ex 1 at 2.) Over the course of seven years, however, the franchise only yielded approximately $10,000 per year in income. (Ptfs' Ex 2 at 1.) In order to supplement the income from their franchise, Plaintiffs established a $150,000 equity line of credit on their home and utilized almost $200,000 of their retirement savings. (*Id.*) Plaintiffs, however, saw their ability to tap into their retirement savings as only a temporary solution to their financial woes. (*Id.* at 1–2.)

In 2006, Plaintiffs began to search for lucrative business opportunities. (*Id.* at 2.) Larry testified that at this time Plaintiffs were still approximately twelve years from either of them being able to qualify for social security. (*See* Ptfs' Ex 1 at 2.) In the spring of 2008, Plaintiffs decided to try to recover their lost retirement savings by purchasing a business with a profitable history. (*Id.*). After considering purchasing two other businesses in Washington, Plaintiffs purchased the Seattle-based American Elevator Corporation (AEC) on April 1, 2009. (Ptfs' Ex 3 at 2.) Plaintiffs purchased AEC for $1,053,000 and took an SBA loan of almost $900,000. Plaintiffs moved to an apartment in Renton, Washington, one month later. (Ptfs' Ex 37 at 2.) Plaintiffs had some mail forwarded to a Post Office Box in Oregon because they owned Marla Electric, an Oregon Business, and they were required to maintain an in-state mailing address. (*See* Ptfs' Ex 1 at 5.) During a turbulent time at AEC, Plaintiffs made Marla Electric the parent company for AEC. Plaintiffs found that the move did not help their eventual legal troubles. Larry testified that Marla Electric has no real business other than being a holding company.

Larry testified that after the 2008 recession, the value of his Beaverton Home dropped below the mortgage balance, and thus Plaintiffs felt it would be unwise to sell it. He testified that the house had significant deferred maintenance, and thus it would not be leased. Throughout

/ / /

their time in Washington, Plaintiffs often visited their Beaverton home on weekends to get away from their business struggles and to maintain the property. (Ptfs' Ex 1 at 7.)

Larry was the CEO/President of AEC and Marilyn was the Vice President; and both performed a variety of other duties at AEC as well. (Ptfs' Ex 1 at 3.) Immediately after taking over AEC, Plaintiffs realized that there were significant problems with the company. In the first week of their ownership, Plaintiffs had to inject $40,000 of cash into the business to meet payroll obligations. (Ptfs' Ex 1 at 6.) In the second week, AEC received a $250,000 invoice for elevator purchases which had not been disclosed by the seller. (*Id*.) Plaintiffs soon discovered that the company was plagued by a number of problems, including problems with the local business community and unions, multiple lawsuits, and financial woes caused by lost contracts. (Ptfs' Ex 3 at 4.) In August of 2009, Plaintiffs hired attorneys to investigate their purchase of AEC. (Ptfs' Ex 1 at 6.) Plaintiffs commenced a lawsuit against the seller of the company, which resulted in Plaintiffs recovering monies held back in escrow. (*Id.*) The law firm recommended a second, more comprehensive, lawsuit be instituted; however, Plaintiffs lacked the resources to proceed with other litigation. (*Id.*)

In 2010 and 2011, Plaintiffs renewed their Oregon driver's licenses. (Def's Ex B at 11–12.) Larry testified that he was unaware that he was required to obtain a Washington license. Larry also testified that Plaintiffs maintained their voter's registration in Oregon, and in 2012 he voted in Oregon. Larry testified that he only voted for President and was under the impression that if he did not vote, he would be taken off the voters rolls. Plaintiffs testified that they did not change their personal bank account while in Washington because their account was in a multi-state bank, but they opened bank accounts in Washington for AEC. Prior to 2009, Plaintiffs were members of the Royal Rosarians in Portland and participated in Rose Festival events. After

2009, Plaintiffs remained members of the group but limited their participation to events in Washington. Plaintiffs attended the same church in Oregon for approximately 20 years, but their attendance became sporadic when they relocated to Washington.

While in Washington, Plaintiffs joined the Master Builders association and the Washington Multi-Family Housing Association. (Ptfs' Ex 2 at 4.) Larry testified that Plaintiffs did not join any other social organizations because they were so busy trying to solve problems with AEC. Marilyn testified that Plaintiffs were involved with some Rosarian events in Washington. Larry testified that two of his children came up to Washington to assist with AEC, and a third child came up to help for a while.

In November of 2011, AEC filed a Chapter 11 bankruptcy, but the case was dismissed on procedural grounds. (Ptfs' Ex 1 at 8.) Plaintiffs then reassessed the company's status and concluded that, because AEC's activity was improving, Plaintiffs would hold off on refiling for bankruptcy. (*Id.*) Plaintiffs testified that they worked sixty hours per week at AEC and were also available during their off hours.

Plaintiffs testified that by 2012 they were tired of renting and began looking for a house in Washington to purchase. Plaintiffs engaged a realtor in the area and eventually found a house; however, they were unable to secure a loan due to their financial condition related to their purchase and ownership of AEC. (*See* Ptfs' Ex 2 at 5.) By 2013, Plaintiffs' Beaverton home had increased in value. Plaintiffs discussed whether to sell the property but decided to retain it just in case their efforts to turn around the troubles at AEC were unsuccessful. After 5 ½ years of losses the company closed on October 31, 2014. Despite Plaintiffs' hope and efforts to run AEC, both the company and Plaintiffs filed for chapter 7 bankruptcy in 2015. At the time of that filing, the

/ / /

company's debt was approximately $1.4 million. (Ptfs' Ex 1 at 8.) Plaintiffs testified that they returned to Oregon, with the intent to remain, on December 1, 2014.

## II. ANALYSIS

The issue before the court is whether Plaintiffs were domiciled in Oregon during the 2011 tax year.

A.    *Domicile*

Oregon imposes a state income tax on every resident of this state and every nonresident with Oregon-source income. ORS 316.037(1), (3).[3] Oregon defines a resident as "[a]n individual who is domiciled in this state unless the individual: (i) Maintains no permanent place of abode in this state; (ii) Does maintain a permanent place of abode elsewhere; and (iii) Spends in the aggregate not more than 30 days in the taxable year in this state[.]" ORS 316.027(1)(a)(A). Thus, residency is statutorily equated with domicile. Domicile is a common law concept composed of two components: (1) "a fixed habitation or abode in a particular place" and (2) "an intention to remain there permanently or indefinitely." *dela Rosa v. Dept. of Rev.* (*dela Rosa*), 313 Or 284, 289, 832 P2d 1228 (1992) (internal quotation marks omitted). Oregon Administrative Rule (OAR) 150-316-0025(1)(a) defines domicile as "the place an individual considers to be the individual's true, fixed, permanent home" and as "the place a person intends to return to after an absence." Although an individual can have more than one residence, he or she "can have but one domicile." *dela Rosa*, 313 Or at 289 (quoting *Reeds Will*, 48 Or 500, 508, 87 P 763 (1906)).

Once a domicile is established or determined to be in a particular location, it will remain there until a taxpayer can demonstrate three things: (1) the taxpayer has a residence in another

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

place; (2) the taxpayer intended to abandon the old domicile; and (3) the taxpayer intended to acquire a new domicile. *Elwert v. Elwert*, 196 Or 256, 265, 248 P2d 847 (1952); *cf. White v. Dept. of Rev*, 14 OTR 319, 321 (1998). A change in domicile is a question of fact that the taxpayer has the burden of proving by a preponderance of the evidence. *See* ORS 305.427. "Because the criteria governing domicile are unavoidably subjective, the court cannot simply rely on the potentially self-serving testimony of the person or persons concerned; the question must be answered by reference to the objective circumstances and the overt acts of the person or persons at issue." *Seghetti v. Dept. of Rev.*, TC-MD 150407C, WL 3079040 (Or Tax M Div, May 23, 2016) (quoting *Hillenga v. Dept. of Rev.*, 21 OTR 396, 401 (2014)). "Factors that contribute to determining domicile include family, business activities and social connections." OAR 150-316-0025 (1)(a).

    1. *Residence in Oregon and Washington*

There is no dispute that Plaintiffs established a residence, and domicile, in Oregon prior to 2009. Plaintiffs moved to a new residence in Washington in the spring of 2009, and reestablished Oregon residency in December 2014.

    2. *Intent to abandon Oregon domicile/ Intent to acquire a Washington domicile*

Plaintiffs argue that they intended to abandon Oregon as their domicile in 2009 and acquire Washington as their new domicile. Defendant argues that Plaintiffs' continued ownership of their Beaverton property and their use of that address and an Oregon Post Office Box for some mail; their failure to surrender and renewal of their Oregon driver's licenses; Larry's voting in Oregon on one occasion in 2012; and their failure to establish a bank account in Washington, tend to show that Plaintiffs did not intend to abandon Oregon as their domicile.

/ / /

Defendant has certainly shown that Plaintiffs maintained lingering connections to Oregon after they moved to Washington. However, this court has previously held that lingering connections to one state do not prevent the court from concluding that a taxpayer effected a change in domicile. In *Hudspeth v. Department of Revenue*, the taxpayers were absent from Oregon for 16 months, "did not sell their home in Prineville, [Oregon,] * * * the husband continued his Oregon Elks Lodge membership, * * * his Oregon voting registration remained on the books, * * * he maintained a bank account in Prineville, * * * he paid dues at the golf club in Prineville, * * * he purchased no home in * * * New Mexico, and made use of a mobile home in * * * Colorado." 4 OTR 296, 299 (1971). The taxpayer-husband in *Hudspeth* testified that he had "tried to sell his Prineville home but found no takers," that he "did not vote by absentee ballot during his absence," and that he "had no time to take care of or give consideration to minor matters such as shifting bank accounts, cutting down on dues payments, and the like[.]" *Id*. at 300. The court accepted his explanations and concluded that the taxpayers had effected a change of domicile. *Id.* at 301.

Plaintiffs' lingering connections to Oregon and their failure to permanently relocate to Washington and establish Washington social connections are certainly problematic for their case—especially if we look backwards in time from when they returned to Oregon in 2014. However, intent is best viewed under the circumstances as Plaintiffs were experiencing them. The court in *Hudspeth* stated, "Intent must be determined as to each step of the attempted change in domicile as taken; hindsight is to be regarded with suspicion." 4 OTR at 301. When viewed from this perspective Plaintiffs' intent looks different. Plaintiffs put significant investment into their Washington-based business and continued to invest, even to their ultimate peril, until they had exhausted themselves physically and financially. They began their Washington-based

business in 2009 and were swept up immediately in a torrent of crisis which demanded their full attention. It is understandable that Plaintiffs did not establish significant social connections to Washington under those conditions. Similarly, it is understandable that Plaintiffs did not attend to relatively minor matters, like updating their voter registrations, driver's licenses, or bank account during that time. Plaintiffs also demonstrated significant efforts to purchase property in Washington but were unable to do so, due largely to their business challenges. Ultimately, the court is persuaded that Plaintiffs intended to make a permanent move to Washington in 2009 to run their business. It is hard to imagine Plaintiffs spending so much time and money, and nearly risking all of their assets, and not planning to stay. Plaintiffs' retention of a home in Beaverton, which at first was due to economic conditions, and later as a fall back provision should their business fail, is not sufficient to find intent to keep their Oregon domicile. Therefore, the court finds that Plaintiffs were not domiciled in Oregon during the 2011 tax year.

III. CONCLUSION

After careful review and consideration of the evidence presented, the court finds that Plaintiffs were not Oregon residents in 2011. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted.

Dated this ____ day of February, 2018.

_____
RICHARD DAVIS
MAGISTRATE

***If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR. Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.***
***This document was signed by Magistrate Richard Davis and entered on February 21, 2018.***